Jesus Manuel CASTANEDA
and Jessica Castaneda,
Appellants,

v.

TEXAS DEPARTMENT OF PROTEC-
TIVE AND REGULATORY SER-
VICES, Appellee.

No. 08–03–00399–CV.

Court of Appeals of Texas,
El Paso.

Aug. 31, 2004.

Allen Moore, Law Offices of Allen Moore, Odessa, for Appellants.

Lana Shadwick, Houston, for Appellees.

Before Panel No. 4 BARAJAS, C.J., LARSEN, and McCLURE, JJ.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Jesus Manuel Castaneda (Jesse) and Jessica Castaneda appeal from a judgment terminating their parental rights. A jury found that Appellants had endangered the physical and emotional well-being of their son, Jude, and that termination was in the child's best interests. We affirm.

## FACTUAL SUMMARY

Because Appellants raise both a legal and factual sufficiency complaint, we will provide a detailed review of the evidence. On December 31, 2001, four-and-a-half month old Jude was taken to the emergency room for a respiratory problem. He was diagnosed with both RSV[1] and pneumonia, but a chest x-ray revealed a broken collarbone and multiple rib fractures. The emergency room physician ordered additional x-rays and discovered that Jude also had a fractured left leg and left arm. These injuries were in different stages of healing. The fractured leg bone, described as "fresh," was the most recent injury. The treating physician noticed that Jude appeared to be in pain any time he was touched.

### Circumstances of the Birth

Jessica suffered from severe toxemia during pregnancy and was diagnosed with preeclampsia. Jude was born approximately six weeks prematurely and weighed five pounds at birth. When he was only two to three weeks old, Jessica noticed that he had a bruise on his left ankle which

looked like it had been caused by a finger wrapped around his ankle. Jessica believed her husband had caused the bruise while changing the baby's diaper. He also had circular bruises on his abdomen and torso which looked like they had been caused by fingertips. According to Jesse, the baby began having health problems related to allergies at the age of two months. Consequently, he was switched to several different formulas in an effort to relieve the allergies and colic.

### Circumstances of the Injuries

On December 17, 2001, Jessica planned to take Jude to the doctor for a routine checkup and immunizations. As she was leaving her home, Jude tumbled from his car carrier because he had not been buckled in when she picked it up. He hit the coffee table from a height of a foot and a half to two feet. Although the doctor examined the child that same day and administered vaccinations, Jessica failed to mention the fall. A few days later, she noticed that his leg and shoulder were swollen. She called the child's doctor, Dr. Desai, to ask whether the immunization could have caused his leg and shoulder to swell. Once again, she did not mention that he had fallen and Dr. Desai told her to take him to the emergency room. X-rays revealed a broken collarbone.

A few days thereafter, Jesse and Jessica became concerned that the baby's respiratory problems were not improving and they switched pediatricians. Dr. Violetta Bello began treating Jude and as part of the medical history, Jessica reported that Jude had a broken collarbone. Dr. Bello also noticed a swollen leg but Jessica told her that the baby had just received a vaccination in that leg. On December 30,

---

1. RSV is an acronym for Respiratory Syncytial Virus, a common cause of lower respira- tory infections in children

Jessica became upset when Jesse pulled the baby by the left arm on the side where the collarbone was broken as he tried to turn him over. As they argued, Jesse threw the telephone at her, but it hit his toddler daughter.[2] Jessica took Jude and went to her mother's home. During their discussion, Jessica's mother revealed that she had seen Jesse shake the baby on Thanksgiving Day.

On December 31, Jessica called Dr. Bello to report that the child's respiratory distress had not improved. Dr. Bello recommended that she take him to the emergency room. The emergency room physician called Dr. Bello and informed her that Jude had multiple broken ribs and a broken arm in addition to the fractured collarbone. Additional x-rays revealed that he also had a fresh fracture of the left femur. Dr. Bello then reviewed the x-rays herself.

Medical professionals notified authorities and representatives from the Odessa Police Department and the Department of Protective and Regulatory Services responded. Teresa Burnett, an investigator with DPRS, interviewed both Jessica and Jesse. Jessica told her she noticed bruises on the baby when he was two or three weeks old. One was about an inch wide around his left ankle. There were circular bruises on his ribs and chest area "that were like fingers." Jessica was nonemotional in their conversation. She denied hurting her baby or knowing anyone who would hurt the baby but she told Burnett that the injuries must have been caused by her husband. Jesse told her that he might have broken his son's ribs by squeezing him. Jesse demonstrated how he held the infant on his lap and bent forward, squeezing him. He also told Burnett that on another occasion, he squeezed the child with his hands into a small ball to stop him from crying. Jesse further claimed that

Jude might have been injured when he accidently fell off the bed. Jesse admitted getting into an argument with Jessica after he pulled Jude by his arm and Jessica accused him of being too rough with the baby.

Two police officers also responded to investigate. Officer Kris Gregg recounted that Jesse said his wife and mother-in-law complained that he was too rough with the child. Jesse explained that the baby's injuries might have been caused from his "crunching" or "scrunching" the baby into a ball to get him to stop crying. The officer demonstrated that he did it "[b]y folding the baby in half forward, with the legs touching the head, the feet touching the head." Jesse also told him about an incident where the child was spitting up milk and Jesse tried to "squeeze" his son "in an attempt to get all the milk out so that it wouldn't be able to spit anything else up." The jury watched the videotaped investigation in which Jesse demonstrated these events himself. Detective Darryl Smith testified to the difference between the grandmother's taped statements and her trial testimony. On tape, she said she saw Jesse shake the baby on Thanksgiving Day. By the time of trial, she had backed away from her statements to police.

The jury also heard evidence concerning Jude's condition when he was transported to foster care. The baby had a startle reflex "where his little hands would, like, go up to the side and they would shake like he was afraid." He screamed every time he was touched. Yet he has thrived with his foster parent—he runs around, he plays, he laughs and is a healthy baby now. Significantly, he has not suffered any broken bones since his placement in foster care.

2. The little girl is a child of a prior relation- ship and is not Jessica's daughter.

### Expert Testimony

Dr. James Sheehan, a diagnostic radiologist, testified to his review of Jude's x-rays. The films from December 20 showed an acute fracture of the left clavicle which showed no evidence of healing. The x-rays from December 31 revealed multiple fractures of the ribs that were healed or at an advanced stage of healing. A skeletal survey was also performed and reflected numerous healing fractures. Dr. Sheehan described for the jury how the age of the fractures could be determined. "Healing fractures produce cloaking of the bone, particularly—cloaking meaning, calcium around the outside of the bone." Eleven months later, another skeletal survey showed additional healing, except that the left thigh bone showed significant residual deformity. It was angulated and had healed with two centimeters of shortening. He found no evidence of scurvy or other bone disease. In his opinion, the fractures were caused by abuse.

Dr. Bello explained that Jude had tried a number of infant formulas but continued with his allergies and respiratory problems. She changed his formula again in an attempt to reduce the colic. Each of the formulas had provided all the nutrition the baby required and he was gaining weight. The vaccinations given were standard and she had never encountered the situation where the vaccine made the child ill or predisposed him to illness, nor had she ever heard of a child having a broken bone caused by a vaccination. Dr. Bello also testified that Jessica was not surprised when she found out the baby had broken bones:

> And what really has kept me always wondering about Jude and Mrs. Castaneda is when I told her about that her son had signs of abuse, that CPS was going to be involved, and that they will be the ones making the decision, instead

of her turning around and asking me, "How do you"—"How do you think that could happen? I don't believe you. You need to prove that to me" or anything, she just teared for one or two seconds and she turned around and got the phone to call her husband."

Michele Hayley–Disilets, a licensed professional counselor, interviewed both Jessica and Jesse. She testified that Jessica wouldn't leave Jesse in order to get the baby back—"I think she felt like she needed to support him." In her discussions with Jesse, he demonstrated how he "crunched" the baby. "And he stated that he was tired of the baby crying so much and that he had become frustrated." He also used a stuffed lion to show her how he saw the baby's head banging up and down on the bed as if one were shaking him. "He stated that he saw it happening but he didn't know if it was he, himself, doing it."

Q:Did that cause you some concern when he made that statement to you?

A:Yes.

Q:Why is that?

A:Well, I mean, you know, I wondered if he was really lucid or understanding of what had happened.

Q:What about—any further demonstrations with the toy?

A:One night when the baby kept throwing up all the time—throwing up his milk, he picked up the lion, and he said he picked up the baby and repeatedly squeezed the stomach area, which I'm doing now, squeezing the lion's stomach area, and watching the baby vomit. And it was projectile vomiting and he— he watched the vomit come shooting out of the baby's mouth. When asked, he had no idea why he kept doing this to the baby, except that it seemed he was sort of fascinated by how it looked.

Q:Now, did he tell you he was fascinated or was that your impression of his demeanor at that time.

A:Her used the word fascinated. I have that in quotes.

Jessica told her that "she felt that we should all ignore" the broken clavicle "and the word 'ignore' was hers, because it was *accidental and neither of them meant to harm the baby.*"

Finally, we turn to the testimony of Appellants' expert witness, which is the crux of their sufficiency challenge. Dr. Harold Buttram is a physician from Quakertown, Pennsylvania. He is not board certified in any field, but practices environmental medicine. He has testified as an expert four times.

Dr. Buttram opined that the baby's injuries were the result of a disease process. Based on a review of the medical records and interviews with Appellants, Dr. Buttram concluded that the bone fractures resulted from natural causes. Jessica suffered from severe toxemia during pregnancy caused by placental vascular insufficiency, and consequently, her doctor delivered the baby at approximately thirty-five weeks' gestation. Due to the toxemia and premature birth, Dr. Buttram believed that Jude had received insufficient prenatal nutrition.[3] Insufficient blood flow from the placenta can cause deficiencies of calcium, vitamin D and vitamin C. Consequently, the child may have been born with subclinical scurvy and brittle bone disease such that he could suffer fractures from normal handling. Based on his review of the x-rays, Dr. Buttram believed that the fractures were of a spontaneous nature. He explained that there are five conditions of brittle bone disease—rickets, scurvy, osteomalacia, osteogenesis imperfecta [classical brittle bone

disease thought to be due to a zinc deficiency] and temporary brittle bone disease caused by a lack of fetal movement due to the lack of amniotic fluid or tumors. The tests for rickets and scurvy were not performed; a test for osteogenesis imperfecta was normal. His opinion was based upon his review of the medical records, inasmuch as he had not examined the child.

Dr. Buttram also believed that the administration of vaccines was ill advised and that the shots had triggered the child's illnesses. While the fractures probably took place prior to the vaccinations, the illnesses would have prevented their adequate healing. Simply stated, the recurrent vomiting contributed to his nutritional deficiencies.

Dr. Buttram did not testify in terms of reasonable medical probability. Instead, he offered the following:

Q:Is there any way, Doctor, to absolutely determine that Jude suffered from this condition?

A:The appropriate tests were not done at the appropriate time.

Q:Now, there is no possible way of determining it now, so we're in a situation where it's your opinion against possibly other opinions?

A:I think we're dealing with likelihoods here.

### Testimony of the Parents

Jesse testified at trial and recanted his statements during the police interviews which, as we have mentioned, were videotaped. Excerpts from his trial testimony follow:

Q:So did you intentionally squeeze him or hold him on his tummy to stop

---

**3.** He believed the child was nutritionally deficient from conception, even though the child had a normal birth weight "Five pounds is a good—it's a fairly good birth weight."

him from spitting up or get him to finish spitting up or what?

A:That, I honestly don't know why I did that. I just did that.

* * * * *

Q:There was also—your statement indicated one or two incidents where you hold the baby above the mattress and the baby's head was hitting back and forth on the mattress. Do you remember those incidents?

A:No.

Q:You don't remember them?

A:That never happened.

Q:Then what was—what was your testimony on the tape referring to?

A:That was—the detective kept asking me question after question, and a lot of them were the same type of question or the same questions over and over. And at that time, that was like—from seeing it now, I mean, that was towards the end and when I—thinking back on that, me saying that, you know, I really don't have a reason for saying that, but I know that I never did that. I know that never happened.

Q:So you made it up when you made the statement on the tape.

A:That part, yes.

Q:You did make that up?

A:Yes.

Q:Why is that?

A:I don't know. I just said—

Q:You just said it was because it came to your head?

A:I said it because I just said it.

* * * * *

Q:Now, I did notice on your statement you made reference to one time where you cut off Jude's wind. Do you remember making that statement?

A:Yes.

Q:And do you remember that incident?

A:Well, that was at the same time when I stayed up with him that night.

Q:And did he—what do you mean by staying that you cut off his wind?

A:Well I—when I picked him up like that, when I folded him like that, he had stopped crying, so what's what I meant by that, that he wasn't crying anymore.

Jesse acknowledged that the child had fallen off the bed when he left the bedroom to answer the telephone.

Jessica testified as well. She believed that the broken leg may have occurred when the child was pulled from his swing. She admitted noticing bruises on the baby's ankle and on the lower chest right above the stomach. She didn't mention any of the bruising to the doctors. Yet despite her knowledge of the bruises and the broken bones, she testified at trial that she was not uncomfortable leaving the baby with him. "It's just going to be a lot different. And if he's alone, I'm not going to be, you know, trying to set up cameras and stuff. I know that, you know, we've spoken and stuff and he has told me he honestly cannot remember, you know, where he—you know, a time where he knows, you know, that he's abusing our child and me either."

### *The Litigation*

The Department filed suit to terminate Appellants' parental rights based on allegations that they had knowingly placed or

knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of Jude and had engaged in conduct or knowingly placed Jude with persons who engaged in conduct which endangered the physical or emotional well-being of the child. The jury rejected Appellants' defense, terminated their parental rights, and appointed the Department as the managing conservator.

## VOIR DIRE

In Issue One, Jesse contends that the trial court abused its discretion by allowing the Department to inform the jury panel during voir dire that he had been convicted of criminal charges related to his son's injuries. The Department alleged in its pleadings as one of the statutory grounds for termination that Jesse had been convicted of injury to a child. See Tex.Fam.Code Ann. § 161.001(1)(L)(Vernon 2002)(court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under Section 22.04 of the Texas Penal Code).

Prior to trial, Jesse filed a motion *in limine* seeking to prevent the Department from mentioning in the presence of the jury "any prior convictions or alleged violations of the law" until the trial court had determined the admissibility of the evidence. He relied upon Tex.R.Evid. 609 in support for his argument, but he also contended that the probative value of the evidence was substantially outweighed by unfair prejudice. During the hearing, Jesse's attorney informed the court that the trial judge in the criminal case, Judge Watkins, had heard a motion for new trial but had not yet issued a ruling.[4] Finding that Rule 609 related only to impeachment and that Jesse's criminal conviction related to the grounds for termination, the trial court denied the motion in limine. The judge told Jesse's attorney that she would rule on any objections during trial. Counsel asked the court to rule on the admissibility of the evidence prior to trial and the judge again ruled that it was relevant to one of the grounds for termination.

During *voir dire,* the Department's attorney, Dewey Britt, engaged in the following colloquy with a prospective juror:

[Prospective juror]:I was wondering if there's any way for us to know if there was a previous charge—same charge or a similar charge. Is there any way for us to have that information?

[Mr. Britt]:You mean if there was a prior CPS investigation on this family?

[Prospective juror]:A charge.

[Mr. Britt]:A criminal charge?

[Prospective juror]:Un-huh. Or past history.

[Mr. Britt]:Sure. And I think it's in the evidence that you'll hear that criminal charges have been brought. Is that what you're asking about?

[Prospective juror]:Previous.

[Mr. Britt]:Regarding different incidents or prior incidents?

[Prospective juror]:Un-huh. Prior incidents.

---

4. Counsel stated as follows: "The Defendant has no final conviction in the prior trial. In fact, the Motion for a New Trial was heard yesterday, and Judge Watkins has not entered a decision on that."

[Mr. Britt]:Well, I think the evidence you'll hear is about the incident that led up to this. This was a new baby. So you're asking about incidents regarding other children that these people—prior children?

[Prospective juror]:Yes.

[Mr. Britt]:Well, as far as that goes, it should be all over this incident.

Jesse did not object. The following morning after voir dire had concluded and the jury had been selected, the trial court reversed its prior ruling on Jesse's motion to exclude this evidence. The court announced that it had reconsidered the ruling because Judge Watkins had granted a new trial in the criminal case. It then granted Jesse's motion to exclude the evidence on the basis of Tex.R.Evid. 403.

 A motion *in limine* is designed solely to require an offering party to approach the bench and inquire into the admissibility of the evidence at issue before introducing that evidence to the jury. *See Hartford Accident & Indem. Co. v. McCardell,* 369 S.W.2d 331, 335 (Tex.1963); *Trevino v. Texas Department of Protective and Regulatory Services,* 893 S.W.2d 243, 249 (Tex.App.-Austin 1995, no writ). The grant or denial of a motion in limine has no bearing on the ultimate admissibility of the evidence and is never reversible error. *Trevino,* 893 S.W.2d at 249. Thus, the error, if any, relates to the discussion of this evidence during voir dire.

 We first note that the record does not support Jesse's argument that the Department informed the jury that Jesse had been convicted of criminal charges arising from his son's injuries. Britt merely stated in response to a question that criminal charges had been brought in the case. He did not specify that criminal charges had been brought against Jesse or that Jesse had been convicted. Jesse also remarks in his brief that the trial court

denied his motion in limine even though a new trial had been granted in the criminal case, but the record simply does not bear out this assertion. The record does not reflect exactly when Judge Watkins granted the motion for new trial but counsel for Jesse informed the trial court on two different occasions during the pretrial hearing that Judge Watkins had not yet ruled. At that point and as far as the trial court knew, Jesse had been convicted of injury to a child and the conviction would have been admissible on the issue of termination under Section 161.001(1)(L). Under these circumstances, the trial court did not abuse its discretion by initially ruling that the evidence would be admissible at trial or by impliedly ruling that the parties could voir dire the jury panel on the issue. *See Trevino v. Texas Department of Protective and Regulatory Services,* 893 S.W.2d 243, 249–51 (Tex.App.-Austin 1995, no pet.)(there was no error by court in proceeding on termination of parental rights in initially granting father's motion in limine to prevent any evidence or underlying facts relating to his arrest, conviction, and confession to involvement in death of his minor nephew to be presented and then reversing its position after completion of voir dire to allow evidence on conviction and incarceration and to allow parties to examine jury panel on those issues). Moreover, counsel failed to object when the subject of criminal charges emerged during the Department's voir dire. Error, if any, has been waived. Issue One is overruled.

## SUFFICIENCY OF THE EVIDENCE

 In Issues Two through Nine, Appellants challenge the legal and factual sufficiency of the evidence supporting the jury's findings relevant to termination of their parental rights. They initially failed to file a complete appellate record. In

response to our inquiry just prior to submission, the court reporter notified us in writing that Appellants' attorney specifically requested that she not include the exhibits in the reporter's record. Missing from the record were Jude's birth records, hospital records, x-rays, medical records, photographs, and recorded interviews of witnesses which conflicted, in some respects, with their trial testimony. If an appellant requests a partial reporter's record and includes in the request a statement of the points or issues to be presented on appeal, the appellate court must presume that the partial reporter's record constitutes the entire record for purposes of reviewing the stated points or issues. *See* TEX.R.APP.P. 34.6(c)(1), (c)(4). Strict compliance with Rule 34.6 is not necessary, but *some compliance is required. See Bennett v. Cochran,* 96 S.W.3d 227, 228 (Tex.2002)(appellant did not waive legal and factual sufficiency complaints where appellant who filed partial record identified issues two months late under appellate rules, but appellee was not harmed by the delay). If only a partial reporter's record is requested and the appellant completely fails to submit a statement of points or issues, the presumption arises that the omitted portions of the record support the judgment. *See Bennett,* 96 S.W.3d at 229.

During oral argument, we inquired of Appellants' counsel whether the sufficiency points had been waived due to his failure to bring forward a complete record. Following argument, counsel filed a motion to supplement in which he characterized the question as a request that the exhibits be filed. While the motion was pending, the reporter filed the exhibits.

■ The Supreme Court has determined that the appellate rules are to be liberally construed so that decisions of the courts of appeals turn on substance rather than procedural technicality. *Crown Life*

*Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121 (Tex.1991). An appellate court abuses its discretion if pre-submission leave to supplement is denied absent any finding of unreasonable delay. *Id.* Post-submission leave to supplement is frequently denied. *Id.* at 122. However, the denial of even post-submission leave may constitute an abuse of discretion. *Silk v. Terrill,* 898 S.W.2d 764, 766 (Tex.1995). Given the constitutional dimension of the parent-child relationship, we have granted the motion and reviewed the exhibits.

### *Termination under Section 161.001*

■ In proceedings to terminate the parent-child relationship, the petitioner must establish by clear and convincing evidence one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child. TEX.FAM.CODE ANN. § 161.001(1), (2)(Vernon 2002); *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex.1984). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services. v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987).

■ At issue here are Sections 161.001(1)(D) and (E). The Department alleged that Jessica and Jesse had each knowingly placed or knowingly allowed their infant son to remain in conditions or surroundings which endangered the physical or emotional well-being of the child or that they engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the baby's physical or emotional well-being. *See* TEX. FAM.CODE ANN. § 161.001(1)(D), (E). Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's

emotional or physical health. *Boyd*, 727 S.W.2d at 533; *Doyle v. Texas Department of Protective and Regulatory Services*, 16 S.W.3d 390, 394 (Tex.App.-El Paso 2000, pet. denied). While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Doyle*, 16 S.W.3d at 394. Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. *See In Interest of B.S.T.*, 977 S.W.2d 481, 484 (Tex.App.-Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.*, 728 S.W.2d 73, 83–84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle*, 16 S.W.3d at 394. This provision addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle*, 16 S.W.3d at 394; *B.S.T.*, 977 S.W.2d at 484; *S.H.A.*, 728 S.W.2d at 84. Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle*, 16 S.W.3d at 395; *B.S.T.*, 977 S.W.2d at 484; *S.H.A.*, 728 S.W.2d at 83–84.

### ENVIRONMENTAL ENDANGERMENT

Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In Interest of W.S.*, 899 S.W.2d 772, 776 (Tex. App.-Fort Worth 1995, no writ); *D.O. v. Texas Department of Human Services*, 851 S.W.2d 351, 354–55 (Tex.App.-Austin 1993, no writ); *In Matter of B.R.*, 822

S.W.2d 103, 105–06 (Tex.App.-Tyler 1991, writ denied). For example, an environment which routinely subjects a child to the probability that he will be left alone because his parents or caregivers are incarcerated endangers both the physical and emotional well-being of a child. *See In Interest of S.D.*, 980 S.W.2d 758, 763 (Tex.App.-San Antonio 1998, pet. denied)(parents repeatedly jailed due to illegal drug use and drug-related criminal activity).

### ENDANGERMENT BY PARENTAL ACT OR OMISSION

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions. *In Interest of R.D.*, 955 S.W.2d 364, 368 (Tex.App.-San Antonio 1997, pet. denied); *Dupree v. Texas Department of Protective & Regulatory Services*, 907 S.W.2d 81, 83–84 (Tex.App.-Dallas 1995, no writ). The conduct to be examined includes what the parents did both before and after the child was born. *In Interest of D.M.*, 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.); *Dupree*, 907 S.W.2d at 84. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree*, 907 S.W.2d at 84; *In Interest of C.D.*, 664 S.W.2d 851, 853 (Tex.App.-Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Tex.Fam.Code Ann. § 161.001(1)(E); *In Interest of K.M.M.*, 993 S.W.2d 225, 228 (Tex.App.-Eastland 1999, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be

inferred from parental misconduct. *In Interest of N.K.,* 99 S.W.3d 295, 300 (Tex. App.-Texarkana 2003, no pet.).

### Standard of Review

Due process requires the application of the clear and convincing evidence standard in cases involving the termination of parental rights. *In Interest of J.F.C., A.B.C., and M.B.C.,* 96 S.W.3d 256, 263 (Tex.2002), *citing Santosky v. Kramer,* 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Codifying the constitutional requirement, the Family Code provides that the burden of proof in termination cases is clear and convincing evidence. TEX.FAM.CODE ANN. § 161.001(1), (2). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX.FAM.CODE ANN. § 101.007 (Vernon 2002). This intermediate standard falls between preponderance of the evidence of ordinary civil proceedings and the reasonable doubt standard utilized in criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979).

Given this elevated burden of proof, the traditional legal and factual sufficiency standards of review are inadequate. *J.F.C.,* 96 S.W.3d at 265; *In Interest of C.H.,* 89 S.W.3d 17, 25 (Tex.2002). The traditional legal sufficiency standard, which upholds a finding supported by anything more than a scintilla of evidence, is inadequate when proof by clear and convincing evidence is required. *J.F.C.,* 96 S.W.3d at 264–65. Instead, review must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. *Id.* at 266. To give appropriate deference to the fact finder, the reviewing court must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. Consequently, a court should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible, but it doesn't require a court to disregard all evidence that does not support the finding. *Id.* at 266. If the court determines that no reasonable fact finder could form a firm belief or conviction that the matter to be proven is true, then the evidence is legally insufficient.

In a factual sufficiency review, we must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *Id., citing In Re C.H.,* 89 S.W.3d at 25. The inquiry must be whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved disputed evidence in favor of its finding. While we do not view the evidence in the light most favorable to the challenged finding, our review must maintain the respective constitutional roles of juries and appellate courts. *Id.* at 26. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that the fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *J.F.C.* 96 S.W.3d at 266.

### Evidence Related to Statutory Predicate for Termination

While the medical experts do not dispute the existence of multiple fractures, they do disagree on the cause. The radiologist reported "numerous healed fractures

including rib fractures bilaterally along with what appear to be more recent fractures of the distal right femoral metaphysis and the proximal left tibial metaphysis and the left clavical. The multiplicity of bone injuries at different stages of healing suggest a history of physical abuse." Dr. Bello reported no evidence of scurvy, rickets or brittle bones disease. As to the sufficiency of the evidence to support Jesse's termination, he admitted "crunching", "scrunching" and "squeezing" the child. He told the counselor that he was "fascinated" with watching the projectile vomiting. He admitted to frustration in trying to get the child to stop crying. Both his wife and his mother-in-law cautioned that he was too rough with the baby. While the videotape captured his tears while the investigator was out of the room, it also captured his admissions. His recantations were based solely on Dr. Buttram's "diagnostic impression." Dr. Buttram's opinion, while in conflict with those of Dr. Sheehan and Dr. Bello, was a matter of credibility left to the determination of the jury. The evidence is such that the jury could reasonably form a firm belief or conviction of physical endangerment. In so finding, we have assumed that the jury resolved disputed facts in favor of its finding if a reasonable fact finder could do so and we have disregarded all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. Consequently, it is legally sufficient. Turning to factual sufficiency, we have considered whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. While we do not view the evidence in the light most favorable to the challenged finding, our review must maintain the respective constitutional roles of juries and appellate courts. Having applied the appropriate heightened standard of review, we find the evidence factually sufficient as well.

■ The evidence underlying the statutory predicate is also sufficient to terminate Jessica's rights. Despite having told her mother that she was leaving Jesse because he was too rough with the child, she continued to leave the baby with him. She told the investigator that Jesse must have been the one to abuse Jude, that she had found the bruises when the child was a newborn, and that the pattern of bruises resembled fingerprints. She wasn't surprised to learn of the injuries. She wasn't willing to leave Jesse in an effort to regain custody of her son. And at trial, she admitted that she was not uncomfortable leaving the baby with him. She wasn't going to use cameras to be sure; it was all just going to be "different." Jesse "has told me he honestly cannot remember, you know, where he—you know, a time where he knows, you know, that he's abusing our child and me either." Applying the appropriate standard of review, the evidence is both legally and factually sufficient to support a finding of endangerment under subsection (E), which includes both acts and omissions.

### Best Interest of the Child

■ In deciding whether the evidence is sufficient to support the jury's finding that termination is in the child's best interest, we apply the non-exclusive factors found in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). *See also In re Jane Doe 2*, 19 S.W.3d 278, 282 n. 20 (Tex.2000)(recognizing that intermediate courts employ the *Holley* factors to ascertain best interest in conservatorship cases). Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4)

the parental abilities of the individuals seeking custody; (5) the plans for the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *See Holley,* 544 S.W.2d at 371–72.

█ Karrie Emerson, a subcareworker with Child Protective Services, testified that Jude has remained in the same foster placement and was healthy at the time of trial. In her opinion, termination was in child's best interest. In reaching this conclusion, she considered the severity of the injuries, the number of injuries, and their duration—over the entire four months of his life. She considered the failure of the parents and extended family to provide protection. In fact, Jude wasn't placed with family because home studies revealed there was an issue with the parents continuing to have access to Jude. She also considered the child's age—he is not old enough to tell if someone has harmed him and he can't protect himself. Emerson anticipated that Jude would be adopted. Although the foster parent has not expressed a desire to adopt, there is a likely candidate.

Emerson admitted that Jesse and Jessica both love the child and that Jude has enjoyed the attention from their visits, but she has seen no bonding. The parents have been appropriate in their play with him but the child is sometimes standoffish. The parents have also been persistent in their visits and have paid child support.

Della Weaver, a family worker with the Child Protective Services division, testified that the original permanency plan was permanent placement with a relative. This was not the first plan here because of Jesse's admission and Jessica's inability to provide a safe environment for the child.

She admitted that they had not been court ordered to attend parenting glasses but they had attended a 15-week class. Nevertheless, she believed it was in Jude's best interest to terminate. She had considered the emotional and physical needs of the child. There was domestic violence in the home, marital disputes had led to several separations, and in her view they were using the baby to meet their own needs. Jude was caught in the middle.

Weaver had also looked at the emotional and physical danger to the child now and in the future. Jessica had said she sees no reason to keep Jude from Jesse and she doesn't think that he would harm him. "She's basically in total denial that—and causes great concern on his physical and emotional well-being. It puts him right back into danger." There was also an indication of a lack of parenting abilities to not prioritize the child's best needs and safety. Failure to prioritize the child's needs is a serious defect in parenting skills. She had watched the police video and listened as Jesse described how he possibly had caused the injuries. "[E]ven now, there's an omission on Mrs. Castaneda's part of knowing that this was going on and continuing—well, even per the audiotape from her mother that she had shown her mother the bruises and even put her hand on bruises to demonstrate that it was a handprint." Jessica had "disclosed all this information prior to CPS' involvement, and by still allowing this person access to this child, that's an act of omission." Weaver believed that naming the State as permanent managing conservator was better than returning the child to the parents in the event adoption wasn't possible. Finally, the jury heard the testimony of Charlotte Harris, Jude's guardian ad litem, who also recommended termination.

Based upon our review of all of the evidence, we conclude that a reasonable

trier of fact could have formed a firm belief or conviction that termination of the parent-child relationship between Jude and his parents was in the his best interest. Because the evidence is both legally and factually sufficient, we overrule Issues Two through Nine. The judgment of the trial court is affirmed.