COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
|  | § | No. 08-24-00317-CV |
| IN THE INTEREST OF: | § | Appeal from the |
| L.A., G.A., and M.A., | § | 65th Judicial District Court |
| CHILDREN.[1] | § | of El Paso County, Texas |
|  | § | (TC# 2023DCM0095) |

## MEMORANDUM OPINION

Appellant M.H., mother of L.A., G.A., and M.A., appeals the trial court's judgment terminating her parental rights to L.A., G.A., and M.A. and appointing the Department as the children's permanent managing conservator.[2] We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Department's first case

The Department first became involved with Mother in 2018 during L.A.'s birth when she and Mother both tested positive for amphetamines and marijuana. After the implementation of a safety plan, L.A. was removed when she was ten months old because Mother was incarcerated,

---

[1] We use the parties' initials to protect their privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

[2] G.A. is the father of L.A. and G.A., and A.A. is the father of M.A. The trial court also terminated the parent-child relationship between the fathers and the children. Neither father is a party to this appeal.

and methamphetamine was found in the home. At the conclusion of the case in 2020, the Department ultimately appointed Mother as sole managing conservator of L.A. and the case was closed.

### B. The Department's second case

On December 25, 2022, the Department re-entered the picture after receiving an intake on allegations of neglectful supervision at the birth of the youngest child, M.A. At the time of M.A.'s birth, Mother tested positive for amphetamines, marijuana, opiates, and benzodiazepines. M.A. also had amphetamines and marijuana in her system at the time of her birth.

On January 5, 2023, the Department filed suit to terminate parental rights and was appointed temporary managing conservator that same day. On January 18, 2023, L.A. and G.A. were placed with their paternal grandmother, Corinna Escalante, who had been their primary caretaker since the Department's first intervention in 2018. M.A. was initially placed with foster parents on January 25, 2023, and was later relocated to Austin, Texas, with different foster parents on July 25, 2023.

### C. Termination suit and the Department's safety plan

On February 7, 2023, the Department met with Mother to review the service plan, but Mother refused to sign it. On March 10, 2023, the trial court ordered that the service plan continue in full force and effect and ordered Mother to: (1) "maintain a safe and stable home environment for herself and her children"; (2) "obtain and maintain gainful employment"; (3) "participate in, successfully complete, and demonstrate knowledge learned from a course of parenting instruction and follow all recommendations"; (4) "submit to an OSAR assessment and follow all recommendations made by the service provider"; (5) "submit to a psychological evaluation and follow all recommendations"; (6) "submit to a psychiatric evaluation and follow all recommendations"; (7) "participate in substance abuse classes and follow all recommendations

made by the service provider"; (8) "submit to random drug screens by any method requested by the Department, including by UA and hair follicle"; and (9) "participate in domestic violence classes and follow all recommendations made by the service provider." By July 25, 2023, Mother maintained her refusal to sign the service plan, and the Department notified the trial court that it was being filed without her signature due to her refusal. Mother eventually came around and at a hearing held in August 1, 2023, the trial court found Mother had partially demonstrated adequate and appropriate compliance with the service plan.

### D. The bench trial

Trial was held in January 2024. At the time of trial, L.A. was five years old, G.A. was three years old, and M.A. was one year old. Marine Rodriguez, Child Protective Investigations Supervisor, was the Department's first witness and discussed the Department's history with Mother and the children. She detailed the Department's initial intervention in 2018 when Mother tested positive for amphetamines, marijuana, opiates, and benzodiazepines at L.A.'s birth, and L.A.'s subsequent removal. Rodriguez also testified to Mother's positive drug test at M.A.'s birth, which resulted in the Department's second intervention. Rodriguez detailed that Mother admitted to consuming methamphetamine and marijuana just hours before delivering M.A. Mother specifically admitted to consuming marijuana four hours prior to labor and taking three "hits" of methamphetamine 12 hours before. The intake stated that there were two other children, L.A. and G.A., in Mother's care, that there were concerns regarding Mother's feeding and bonding with M.A., and that Mother had also threatened to leave the hospital against medical advice. Rodriguez confirmed that the hospital records note Mother refused to cooperate with the Department and refused the Department's safety plan. Rodriguez also testified that the Department found reason to believe that physical abuse of M.A. had occurred, as well as neglectful supervision of L.A. and G.A.

Maricruz Sanchez, the visitation monitor for Mother and the children, also testified on behalf of the Department. Sanchez monitored the visitations for a year and testified to instances of Mother being physical with L.A. and G.A. She reported that two visits were terminated because Mother used physical discipline with the children. Sanchez described that in one instance, Mother spanked G.A. twice with her hand and in another, Mother grabbed L.A. by the arm, causing L.A. to hit her head. These visits were terminated due to Mother's conduct. Sanchez also reported that Mother used foul language with the children and became easily frustrated with them.

Maria Hernandez, conservatorship specialist for the Department, testified to Mother's reluctance to bring items for the children during visits, particularly for M.A. According to Hernandez, Mother felt that "since the Department had custody of [M.A., the Department was] responsible for her and [were] the ones that needed to care for her and that [the] foster parent was responsible for bringing those items, not Mom." A visitation plan was ultimately filed by the Department to address the Department's concerns regarding Mother's conduct during visitations. The visitation plan prohibited Mother from threatening the children with physical abuse and using foul language, and required Mother to bring diapers, wipes, and formula to visits.[3] In addition, because Mother was regularly on her phone during visitations, the visitation plan prohibited phone usage during the visits and specifically prohibited Mother from calling the children's incarcerated fathers while she was participating in visitations. However, Mother continued to allow the children's fathers to call in during supervised visits.

Hernandez also testified to Mother's service plan and her completion of many of the required services. Mother completed parenting classes, anger management, and submitted to random drug testing, a psychological evaluation, and individual counseling. However, Mother did

---

[3] Although filed, the visitation plan was not signed by the trial court.

not complete an OSAR assessment nor did she complete substance abuse treatment of any kind. Hernandez explained that Mother did not allow the case manager to fully assess her because she "refused" to participate and was reluctant with responses. When asked why she refused to cooperate, Mother claimed that she did not need the assessment because she did not have a substance abuse issue.

Although Mother submitted to regular drug tests, she tested positive for marijuana during the case in April of 2023. In Hernandez's opinion, Mother did not demonstrate a stable environment because throughout the entirety of the case, she went back and forth between living with her mother-in-law and father. At the time of trial, Mother was living with her father and had recently been approved for housing. Hernandez further stated that Mother had not demonstrated an ability to keep all three children safe, as she was living with her father, refused a full substance abuse assessment, failed to complete substance abuse classes, denied having a substance abuse issue, and claimed M.A. was not her responsibility.

Mother also testified. She discussed her approved housing and the items she had purchased for the children. She explained that she learned how to control her temper and how to parent young children, and believed it was in her children's best interest to be with her. However, on cross examination, Mother conceded that she had never started nor completed substance abuse treatment, neither during the first Child Protective Services (CPS) case nor the current one. Despite her positive drug test in April 2023, Mother claimed that the hair follicle test had "very, very low levels" of marijuana and that she had not used drugs since the day M.A. was born. She acknowledged that although her children were removed twice because of her drug use, she had not received drug treatment of any kind.

5

According to her testimony, Mother had a job at a soon-to-open chain restaurant with a specific pay, position, and schedule, but could not confirm these details because she had not yet completed the required training.

Escalante also testified and shared that Mother dropped off L.A. and G.A. with her years ago when Mother was homeless, and that the children have been with her ever since. Escalante soon after discovered Mother was using drugs and, while acknowledging Mother might seem better now, Escalante emphasized her concern about the sustainability of Mother's sobriety and the safety of the children. She outlined the children's routines, described the strong bond she shares with the children, and confirmed her commitment to continuing to meet their needs.

Susan Barron, CASA advocate, testified and recommended termination of Mother's rights to all three children based on lack of stability and safety. Barron expressed concern for Mother's inconsistency with housing and jobs, and her lack of bonding with the children. She described the strong bond L.A. and G.A. have with Escalante and testified that she visited M.A. in Austin, Texas, and saw the stability M.A. has with her foster family.

At the conclusion of the bench trial, the trial court signed an Interlocutory Order of Termination terminating Mother's rights to the three children under subsection E of § 161.001(b)(1) of the Texas Family Code and found termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (2). Mother appealed that order; however, we determined the order was not final or appealable and dismissed the appeal for want of jurisdiction. *In re L.A., G.A. III, and M.E.A.*, No. 08-24-00019-CV, 2024 WL 1776483, at *1 (Tex. App.—El Paso Apr. 24, 2024, no pet.) (mem. op.). On July 30, 2024, the trial court signed a final order terminating Mother's rights to all three children. This appeal followed.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

A parent's "right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." *In re A.C.*, 560 S.W.3d 624, 629–30 (Tex. 2018) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)). And although parental rights are constitutional, they are not absolute, and "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Texas Family Code § 161.001 "balances the convergent and divergent interests of parent and child" and permits termination of a parent–child relationship only if (1) the parent's conduct satisfies at least one statutory ground for termination, and (2) termination is in the best interest of the child. *In re A.C.*, 560 S.W.3d at 630. Due process mandates clear and convincing evidence for each element. *Interest of N.G.*, 577 S.W.3d 230, 235 (Tex. 2019). Evidence is clear and convincing if it is of the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.*; Tex. Fam. Code Ann. § 101.007.

A single ground under Texas Family Code § 161.001(b)(1)(A)–(V) is sufficient to uphold termination on appeal, in addition to upholding a challenged best-interest finding. *Interest of N.G.*, 577 S.W.3d at 237. However, when sufficiency challenges are made under subsection (D) or (E), due process requires that we review the sufficiency of the evidence under those subsections because of the future consequences of those findings in providing predicates for terminating a parent's right to other children. Tex. Fam. Code Ann. § 161.001(b)(1)(M) (parental rights may be terminated if parent "had his or her parent-child relationship terminated with respect to another

child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state").

When the legal sufficiency of the evidence is challenged in a parental termination case, we review all the evidence in the light most favorable to the finding to "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We defer to the factfinder's conclusions, indulge every reasonable inference supporting the finding, and presume the factfinder resolved any disputed facts in favor of the findings. *In re L.D.C.*, 622 S.W.3d 63, 69 (Tex. App.—El Paso 2020, no pet.). As a corollary to this requirement, we must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

In a factual sufficiency review, we must likewise give due consideration to the evidence the factfinder could have reasonably found to be clear and convincing and determine "whether the evidence is such that the factfinder could reasonably form a firm belief or conviction about the truth" of the allegations. *In re J.F.C.*, 96 S.W.3d at 266. We must not substitute our judgment for that of the factfinder. *In re D.R.V.*, No. 08-22-00238-CV, 2023 WL 2544577, at *5 (Tex. App.—El Paso Mar. 16, 2023, no pet.) (mem. op.). The evidence is factually insufficient when, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *In re J.F.C.*, 96 S.W.3d at 266.

## III. ISSUES ON APPEAL

In two issues, Mother challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights, arguing that the Department failed to prove, by clear and convincing evidence, that (1) she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, pursuant to § 161.001(b)(1)(E) of the Texas Family Code, and (2) termination of her parental rights is in the best interest of the children.

## IV. ANALYSIS

### A. Subsection (E): endangering conduct

Subsection E allows termination if the court finds, by clear and convincing evidence, that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). Proof of endangerment is required, which means exposure to loss or injury, or to jeopardize a child's emotional or physical health. *Castaneda v. Texas Dep't of Protective and Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied). The cause of the danger to the child must be the parent's conduct alone, as evidenced by the parent's actions, and by the parent's omission or failure to act. *Id.* We must examine what the parent did both before and after the child was born. *Id.* The conduct need not have been directed at the child, nor must it have resulted in actual harm to the child. *Id.* Additionally, subsection E demands more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*

More specifically, it is well established that a parent's use of drugs may be sufficient to support an endangering conduct finding. *In re J.O.A.*, 283 S.W.3d at 345; *Interest of K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.). Here, nearly one month before L.A. was

born, Mother was sentenced to 30 days confinement for possession of a controlled substance, which she committed in August 2018 while she was pregnant with L.A.[4] Mother continued to use drugs while pregnant with L.A. and tested positive for amphetamines and marijuana at the birth of L.A., one month after being sentenced for the possession of a controlled substance. L.A. also had these drugs in her system when she was born. This was the Department's first intervention with Mother.

Less than a year later, on October 3, 2019, during the pendency of the Department's first case against Mother, she committed two counts of theft and pleaded guilty. She was sentenced to 42 days confinement for each offense. Then, for reasons not provided in the record, the Department appointed Mother as sole managing conservator of L.A. on October 2, 2020, and the case was closed. Two years later, the Department intervened for a second time when Mother tested positive for amphetamines, marijuana, opiates, and benzodiazepines during M.A.'s birth. M.A. also had amphetamines and marijuana in her system. Mother admitted she consumed marijuana four hours prior to labor and took three "hits" of methamphetamine just 12 hours before. Then, during the Department's current case against Mother, she tested positive for marijuana on April 25, 2023.

On this record, a reasonable factfinder could have formed a firm belief or conviction of endangerment. *See Interest of K-A.B.M.*, 551 S.W.3d at 285. ("The commission of criminal conduct by a parent may support termination under Section 161.001(b)(1)(E) because it exposes the child to the possibility that the parent may be imprisoned."); *see also In re R.A.G.*, 545 S.W.3d 645, 650–52 (Tex. App.—El Paso 2017, no pet.); *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.). As we have previously stated, "[a] parent's use of drugs and its effect on his or her ability to

---

[4] L.A. was born on December 17, 2018.

parent may qualify as an endangering course of conduct." *Interest of K-A.B.M.*, 551 S.W.3d at 286; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). And, as the Texas Supreme Court has established, endangering conduct includes "the parent's actions before the child's birth . . . including evidence of drug usage." *In re J.O.A.*, 283 S.W.3d at 345.

Accordingly, viewing the evidence in the light most favorable to the trial court's finding and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we conclude that there was some evidence of endangerment that could be relied upon by a reasonable factfinder to form a firm belief or conviction of endangerment. Mother's first issue is overruled.

## B. Best interest

In determining whether the evidence is sufficient to affirm the trial court's finding that termination is in the children's best interest, we employ the *Holley* factors. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Those factors include:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals . . . ; (G) the stability of the home . . . ; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Id*. These factors are not exhaustive, and a court may consider other factors. *Interest of K-A.B.M.*, 551 S.W.3d at 287. Additionally, evidence of each factor is not required to terminate the parent-child relationship and the focus for this determination is on the child, not the parent. *Id*.

11

**(1) The children's desires**

We begin with the children's desires. At the time of trial, L.A. was five years old, G.A. was three years old, and M.A. was one year old. "When a child is too young to express his [or her] desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent." *Interest of G.C.S.*, 657 S.W.3d 114, 134 (Tex. App.—El Paso 2022, pet. denied).

As discussed above, L.A. and G.A. have been cared for by their paternal grandmother, Escalante, since before the Department's involvement. Escalante testified that Mother dropped off L.A. and G.A. with her in July 2021 when Mother was homeless and using drugs, and the children have been with her ever since. Escalante described the strong bond she shares with L.A. and G.A. and confirmed that she meets their physical and emotional needs and provides them with a structured home. The CASA advocate also testified to the strong bond L.A. and G.A. share with Escalante. L.A. expressed her desire to stay with Escalante, whom she considers her mom, and specifically asked if she could still sleep at Escalante's home if she had to return to Mother. The CASA advocate also confirmed that L.A. and G.A. call Escalante "mom" and call Mother by her first name. L.A. and G.A. were described as "thriving" in Escalante's care and as "happy, healthy children that are very loved" by Escalante. As for M.A., she was removed from Mother at birth and has remained with a foster family ever since. She was relocated to Austin, Texas, in July 2023 and at the time of trial, had remained there with her foster parents. Most of Mother's visits with M.A. have been virtual which further undermines Mother's bond with M.A. The evidence shows that M.A. enjoys stability and security with her foster family in Austin, Texas. Overall, the evidence related to this factor weighs in favor of the trial court's best interest finding.

12

**(2)  Current and future physical and emotional needs and physical danger**

The next two factors are the children's emotional and physical needs now and in the future, and the emotional and physical danger to the children now and in the future. *Holley*, 544 S.W.2d at 371–72. The need for permanence is a paramount consideration for these factors. *In re R.A.G.*, 545 S.W.3d at 653. As already discussed, the evidence supports the trial court's finding that Mother's conduct—specifically her continued drug use after a drug possession conviction, during two of her pregnancies, and during the pendency of the termination case while her parental rights were in jeopardy—endangered the children's physical or emotional well-being. *See In re M.R.J.M.*, 280 S.W.3d 494, 502–03 (Tex. App.—Fort Worth 2009, no pet.) ("Drug abuse during pregnancy constitutes conduct that endangers a child's physical and emotional well-being."); *see also Interest of K-A.B.M.*, 551 S.W.3d at 288 ("It is well established that a parent's use of illegal drugs and criminal activity may qualify as conduct that endangers a child's physical and emotional well-being."). Mother also tested positive for marijuana on April 25, 2023, while her service plan was in effect and her parental rights were subject to termination. A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *See In re R.A.G.*, 545 S.W.3d at 651. For these reasons, we find the evidence related to these factors weighs in favor of the trial court's best interest finding.

**(3)  Parental abilities, available programs, and acts and omissions**

We next consider the fourth, fifth, and eighth factors together. The fourth factor is the parenting abilities of the individual seeking custody; the fifth factor examines the programs available to assist those individuals in promoting the child's best interest; and the eighth factor considers the parent's acts or omissions which may indicate that the parent-child relationship is not a proper one. *Holley*, 544 S.W.2d at 371–72. In reviewing the parenting abilities, the factfinder may consider the parent's past neglect or past failure to meet the physical and emotional needs of

13

the children. *Interest of G.C.S.*, 657 S.W.3d at 134. A factfinder can also "infer from a parent's failure to take the initiative to utilize the available programs that the parent did not have the ability to motivate herself in the future." *Interest of K-A.B.M.*, 551 S.W.3d at 289.

Although there was testimony that Mother's parenting abilities slightly improved throughout the case, the evidence showed that Mother used physical discipline with the children on multiple occasions, which resulted in the termination of those visits. There was testimony that Mother used foul language with the children and easily got overwhelmed and frustrated with them, which was concerning because the visitations were only two hours long. Sanchez detailed that "everybody knew" when Mother was visiting the children because Mother would regularly yell at the children loud enough for those "on the other side of the building" to hear. Although there was testimony that Mother appeared "calmer[,]" she was still threatening the children with physical discipline in the more recent visits.

"In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child," a factor we find particularly significant in this case. *Interest of G.C.S.*, 657 S.W.3d at 135. Part of her service plan required her to submit to an OSAR assessment and follow all recommendations made by the service provider, and participate in substance abuse classes and follow all recommendations made by the service provider. The service plan also required Mother to "be cooperative and be honest and open throughout her assessment[.]"

During her psychological evaluation, Mother reported that she did "not have a problem as a result of her substance use." The OSAR assessor was unable to fully assess her because she "refused" to participate and was reluctant with her responses. There was also evidence that Mother was dishonest with the assessor. She did not disclose that the Department had previously intervened, that she had used methamphetamine in the past, or that L.A. and M.A. were diagnosed

14

with neonatal withdrawal symptoms. She also falsely claimed that she had never been arrested for a drug-related offense.

At the final hearing, Mother admitted her children had been removed twice due to her drug use. But when questioned about whether her relapse indicated the services from the first case had failed, she acknowledged relapsing but disagreed that the services were ineffective, stating, "I did relapse, but I wouldn't say that it didn't work." Despite recognizing the role substance use played in her children's removal and her failure to engage in treatment in the first case, or the current case, Mother insisted she would maintain sobriety this time, claiming she had "learned her lesson." We find that Mother's failure to fulfill the court-ordered service plan reflects her unwillingness to utilize the services provided by the Department, further casting doubt on her parenting abilities. We therefore find it was reasonable for the factfinder to conclude that Mother's criminal conduct and drug use, and failure to complete the required drug treatment, support a finding that termination was in the children's best interest. *See Interest of G.C.S.*, 657 S.W.3d at 129 ("evidence of Mother's previous CPS history is a factor the trial court could take into consideration and the trial court is not required to discount a parent's long history of drug abuse, even if the parent claims they have stopped abusing drugs"). In sum, the evidence on these factors supports the trial court's best interest finding.

### (4) Plans, stability, and excuses

We next consider the sixth, seventh, and ninth factors. The sixth factor examines the plans for the child by those seeking custody; the seventh factor is the stability of the home or proposed placement; and the ninth factor is whether there is any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371–72.

At trial, Mother testified about her approved housing and detailed the items she had purchased for her children, including beds, clothes, formula, and food, which she had secured from

15

her income at Cheba Hut. Photographs of these items were admitted into evidence and presented to the trial court. Mother testified it was her intention to keep the children at their current daycares, where they would remain while she was at work. She explained that she had learned to better control her temper, gained parenting skills to care for young children, and expressed it was in her children's best interest to be returned to her care. However, also before the trial court was evidence that raised concern to the stability of Mother's sobriety, housing, and job.

Despite two CPS cases due to Mother's drug use, she never received substance abuse treatment and denied having a substance abuse issue. When asked whether she received substance abuse treatment, Mother stated, "I went to the OSAR assessments and I followed up as needed, what they gave me." While this response might suggest her compliance, the record reflects that Mother did not complete the OSAR assessment and per the service plan, it was her responsibility to complete all recommendations and requirements, including the OSAR assessment and substance abuse classes. Mother did not fulfill either obligation.

The trial court also heard evidence that Mother had a job at Cheba Hut, a soon-to-open chain restaurant with a specific pay, position, and schedule, but Mother could not confirm these details because she had not completed the required training. Despite Mother's testimony on direct examination that she held the position of "assistant general manager" at Cheba Hut, earned $17.75 per hour, and worked morning shifts, her credibility came into question during cross-examination, where she admitted the following:

> COUNSEL: Okay. Ma'am, that's not my question. You failed to complete the training and you cannot be an assistant manager until you do so; correct?
>
> MOTHER: Yeah.
>
> COUNSEL: Okay. And so, what are your hours. Do you know?

| | |
|---|---|
| MOTHER: | Not yet. But I will be working mornings, because that's what I let them know that I could work, is mornings. |
| COUNSEL: | Okay. So we just have to take it on faith that they're going to do that, right, that they're going to let you just work mornings? |
| MOTHER: | They hired me with that schedule. |
| COUNSEL: | But you can't tell us that schedule today under oath? |
| MOTHER: | No. |

It is also worth emphasizing, as noted above, that despite her history of drug use and lack of drug treatment of any kind, Mother nevertheless maintained that her plan to stay sober this time was because she "had learned her lesson[,]"—a matter of credibility, which the factfinder was free to believe or disbelieve. *See In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no pet.). We find that a reasonable factfinder could have relied on Mother's history of drug use, her inconsistent testimony, her stated plan to maintain sobriety, her failure to address her substance use, and her denial of having a substance abuse issue, in determining instability, supporting the best interest finding.

The Department also provided evidence that L.A. and G.A. had been placed with Escalante since the Department's 2018 case, that L.A. and G.A. refer to Escalante as "mom" and call Mother by her name, and multiple witnesses testified to the close bond Escalante has with the children and how she "does a great job at providing for the children and bonding with the children and giving them that love that they need." Escalante testified to her efforts in maintaining the children's routines and stability, including taking L.A. and G.A. to school every day since they have been in her care, consistently meeting their physical and emotional needs, ensuring they attend medical appointments, and providing a structured home environment.

As for M.A., she was removed from Mother's care at birth, and the evidence showed she has stability with her foster family, who have cared for her since July 2023. Notably, M.A.'s foster

parents expressed their intent to adopt her and intervened in the case to pursue the termination of Mother's parental rights. We find that the evidence on these factors further supports the best interest finding.

After considering the entire record and reviewing the *Holley* factors, we conclude that the trial court's finding that termination is in the children's best interest is supported by legally and factually sufficient evidence. Mother's second issue is overruled.

## V.  CONCLUSION

For these reasons, we affirm.

MARIA SALAS MENDOZA, Chief Justice

January 22, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.