

**NUMBER 13-11-00683-CV**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**IN THE INTEREST OF K. S., A CHILD**

---

**On appeal from the 377th District Court
of Victoria County, Texas.**

---

**MEMORANDUM OPINION**

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Chief Justice Valdez**

By three issues, appellant, William Foster, appeals from the trial court's termination of his parental rights to K.S., a child, arguing the evidence is legally and factually insufficient to establish grounds for termination under Texas Family Code section 161.001. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2011). We affirm.

## I. BACKGROUND

K.S. was born August 19, 2009. She was conceived shortly after her 18-year-old mother left foster care and began residing with appellant, age 46, his paramour,

Yolanda Guajardo a/k/a Yolanda Foster ("Yolanda"), age unknown, and three of appellant's adult relatives. According to appellant, K.S. was conceived during the course of a one-month affair that secretly took place while K.S.'s mother was staying with appellant, Yolanda, and appellant's relatives. Yolanda was suspicious, but according to appellant, she did not know about the affair, which ended when K.S.'s mother moved out of the home.

### A. Testimony of K.S.'s Mother

K.S.'s mother testified to a different version of events. According to her testimony, appellant expressed interest in having sex with her when she was 17 years old and still in foster care. There was no romantic affair between them, but on one occasion, two weeks after her 18th birthday, when she was living with appellant and Yolanda, appellant had sex with her. She testified that the sexual intercourse was nonconsensual, that she told appellant "no," and did not remember any additional details because she was on medication for bipolar disorder and depression. She moved out of the home afterward and has been staying with friends and living on the streets ever since.

### B. Circumstances of the Department's Involvement

After trying to care for the child on her own, K.S.'s mother placed K.S. with the Montez family, long-time friends of her family. After she placed the child with the Montez family, K.S.'s mother vacillated between leaving the child and keeping the child herself. She had no stable home and could not remain stable enough to care for K.S. On May 21, 2010, appellee, the Texas Department of Family and Protective Services ("Department"), stepped in and removed K.S. from her mother's custody. K.S. has

since remained with the Montez family. Her mother later agreed to voluntarily terminate her parental rights to K.S.

Although appellant knew of the pregnancy, he maintained he was not the child's father, had no contact with the child, made no attempt to contact the child or the child's mother, and did not support the child or the child's mother. After the Department removed K.S. from her mother's custody, appellant was formally notified of his parentage of K.S. He demanded a genetic test to confirm the parentage of K.S. He was confirmed as the biological father of K.S. and was notified by the Department of this confirmation. At the same time, the Department developed a service plan designed to develop appellant's abilities as a parent and notified appellant of the terms of the service plan. Appellant continued to live with Yolanda as his paramour and represented her to be the caregiver for K.S. Yolanda also participated in the services.

### C. Testimony of Kristen Kestler

Kristen Kestler, a former employee with the Department, testified regarding Yolanda's background and personal history as the wife and paramour of physically and sexually abusive men. She testified regarding Yolanda's husband, identified as "Mr. Herrera," who had three children with Yolanda and previously lived with her and the children. Herrera beat Yolanda many times in the presence of her children. In one such incident, witnessed by the children, he stabbed Yolanda in the back and cut her several times, causing her to be hospitalized. Herrera was subsequently convicted and imprisoned for aggravated assault.

At some point thereafter, Yolanda became romantically involved with William Huff, who began living with Yolanda and her three children. One night in 2002, Yolanda

3

found Huff disrobed and in bed with her 12 year old daughter, whose shorts were pulled down, which prompted an outcry and accusations of sexual abuse. Although Yolanda initially reported the incident, she later tried to recant, claiming she did not believe her daughter. At one point, she denied that anything occurred. On other occasions, she blamed her daughter. She took her daughter to various people in the county, including the district attorney's office, to prove that she had changed her story.

Huff was prosecuted for sexual abuse, pleaded guilty, and pursuant to a plea bargain, received community supervision. He became a registered sex offender. While on probation, he returned to living with Yolanda and her three children. The Department discovered the situation and removed the children, placing them with their paternal grandparents who became managing conservators. Yolanda was given possessory conservatorship.

During this process, Yolanda revealed that her daughter had made a separate outcry of sexual abuse involving a relative of her biological father. Yolanda, who continued to blame her daughter for the sexual abuse by Huff even after his conviction, cited this prior outcry as proof that her daughter was sexually active and "was wanting this to happen." She claimed that Huff would drink a lot and that her daughter was therefore able to seduce him as she had done in the past with at least one other man, the relative of her biological father. Yolanda did not take any responsibility for what happened to her daughter. According to Ms. Kestler, Yolanda did not appreciate the severity of those situations nor did she understand that she needed to protect her children.

4

### D. Testimony of Dr. Michelle Moran

Dr. Michelle Moran evaluated appellant and Yolanda as part of their service plans. Dr. Moran testified that, based on her evaluations, neither appellant nor Yolanda would be able to raise the child, K.S.

With respect to Yolanda, Dr. Moran expressed concerns regarding her prior history of poor judgment and lack of protection of her children, her inappropriate expectations of children, and her passivity and dependence on appellant. Further, Dr. Moran was concerned that Yolanda would be physically incapable of caring for K.S., who was two years old at the time of trial. Yolanda has diabetes, hypertension, asthma, obesity, and depression and frequently could not walk more than a few steps or change a diaper and needed to use an oxygen tank during the summer months. According to Dr. Moran, Yolanda is not sufficiently agile to effectively take care of a young child.

Dr. Moran was also deeply concerned with Yolanda's dependency issues. As an example, she cited Yolanda's willingness to reconcile with Huff and to believe his assertions of innocence even though she, with her own eyes, had seen an inappropriate sexual situation between Huff and her 12 year old daughter. Dr. Moran stated that her dependency "marks Yolanda as a very dependent individual who is easily swayed, perhaps naïve, gullible, lacks confidence in her own perceptions and decisions." Dr. Moran stated that this is a strong indication that Yolanda will not be protective of a child. According to Dr. Moran, Yolanda is very likely a person who is going to put her needs ahead of her child's. Dr. Moran stated that Yolanda's history suggests that it is more important to her to get along with her paramour than it is to protect her child from being the victim of sexual abuse.

5

Dr. Moran also testified regarding appellant, noting that he has a history of relationship dysfunction and poor judgment. Appellant has been married to three other women (not including Yolanda), but because he has not been divorced from his second wife, it is unclear whether his third marriage was valid. Yolanda, whom he holds out as his common law wife, uses his last name "for important stuff that [they] have together." Like appellant, she is also currently married to someone else, Herrera, from whom she has not sought a divorce. Appellant did not know that Yolanda is still married to Herrera. Dr. Moran testified that appellant's poor judgment was demonstrated by the history of his three prior marriages and his failure to divorce his second wife before marrying his third wife and later holding Yolanda out as his common law wife. Dr. Moran found it significant that appellant has lost contact with two of the children from his second marriage, and she considered that to be an indicator that appellant is an "unstable" parent.

Dr. Moran noted that appellant characterized his role in the "affair" with K.S.'s mother as passive, relating that "she came on to him and he resisted for some time, but then, you know, it occurred." Dr. Moran believed appellant had displayed poor judgment in beginning the "affair," given that K.S.'s mother had just turned 18 and appellant was involved in a relationship with Yolanda. Dr. Moran also noted that appellant did not disclose the "affair" to Yolanda until paternity of K.S. had been established. She was concerned about Yolanda's anger in response to the disclosure, the problems this created in appellant's relationship with Yolanda, and how the issue of infidelity would continue to come up if Yolanda were to become K.S.'s stepmother.

6

Dr. Moran found it very significant that appellant and Yolanda lacked knowledge about each other's lives. Appellant did not know about Yolanda's involvement with the Department and how Yolanda's biological children had been removed from her. These are facts that, in Dr. Moran's opinion, appellant should have known since he and Yolanda were intending to raise a child together. Yolanda did not know about the issues in appellant's previous marriages or his criminal history. Based on the foregoing, Dr. Moran expressed serious concerns about the emotional intimacy in the relationship and the depth of the couple's family commitment to K.S.

Dr. Moran also testified regarding appellant's criminal history and his lack of candor during their interview. Appellant's criminal history includes a number of arrests; one of them, a sexual harassment charge, resulted in a conviction. This incident involved appellant calling up a woman and telling her in explicit language that he wanted to do various sexual things to her. Appellant was also arrested for injury to a child, but during his interview with Dr. Moran, he could not recall what had happened or what he was alleged to have done. He was arrested again on a similar charge involving allegations of fondling a child, but again, he told Dr. Moran he had no recollection of what he had been accused of or what the charge entailed and he was unable to offer any explanation of his version of events.[1]

Dr. Moran considered a charge of injury to a child to be a significant event in a man's life, one he would remember. With regard to the sex offense of fondling a child, she was concerned about appellant's lack of memory. It was her impression that he just did not want to reveal what had happened or what was suspected to have happened. In

---

[1] Appellant's other arrests include delivery of marijuana, possession of a prohibited weapon, and larceny.

7

her opinion, he was evading the issue. She did not believe he was entirely forthcoming with the details he probably recollected and was making an effort to present himself favorably. It caused Dr. Moran concern to have someone who is not willing to be honest with her raise a two-year-old child such as K.S. Dr. Moran saw this as part of a larger pattern of dishonesty that included appellant's concealment of his sexual activity with K.S.'s mother from Yolanda and his continuing to do so even after the child's birth.

Based on the foregoing, it was Dr. Moran's opinion that it would not be in the best interest of K.S. to be raised in a home where appellant is the father and Yolanda is the stepmother of the child.

### E. Testimony of Christi Hartley-Harvey

Christi Hartley-Harvey, a social worker and forensic psychologist who instructed appellant and Yolanda in parenting and homemaking in connection with their service plan, was also called as a witness to testify at trial. She testified that while appellant and Yolanda completed their assignment, she was not comfortable with their ability to parent a two-year-old child.

With regard to Yolanda, Hartley-Harvey had concerns about her health, based on the same factors noted by Dr. Moran. She also had concerns about Yolanda's history with her own biological children. Yolanda had difficulty understanding why people considered her not having had contact with her children for many years to be abandonment. Yolanda was not able to understand how she failed to protect her children from the abuse they had endured.

With regard to appellant, Hartley-Harvey had concerns about his past and some of the alleged offenses. She noted that appellant talked down to Yolanda and degraded

8

Yolanda.  This happened when they were meeting in the couple's home and when they were in supervised visits with K.S.  Appellant would "snap at Yolanda" and "talk to her in a manner in which he was, in [her] opinion, talking to a child of about six or seven."  According to Hartley-Harvey, Yolanda "just kind of went along with it."  She had concerns with Yolanda being so submissive and appellant being in total control.  That was a "red flag" because Yolanda had a history of unhealthy relationships.  Hartley-Harvey was concerned that this pattern would continue and the child would not be safe.

Hartley-Harvey also testified that appellant stated several times that he did not feel the need to childproof his home as required by the service plan because when he tells his children not to do something or not to touch something, they listen to him.  She testified that it is not reasonable for a parent to expect a two-year-old child to obey just because the parent says so.

Based on the foregoing, Hartley-Harvey testified that, in her opinion, appellant and Yolanda cannot provide a safe, stable environment for K.S.

### F.  Testimony of Appellant

Appellant testified at trial, telling the court, "I'm willing to take care of the child that I made," which prompted the following exchange:

The Court:  Well, now that you're caught, now you want to do something.

[Appellant]:  No.  I've been wanting to.  I've been going to counseling for over a year now to try to get my daughter back.  Since the first day I found out, I've been trying to get her back to my house.

The Court:  And are you also doing your best to make sure you're divorced and living with somebody that's divorced and setting up some kind of family that that child can be proud of?

9

[Appellant]: Yes, sir.

The Court: What are you doing about that?

[Appellant]: We're working on getting divorces.

The Court: What? What are you doing?

[Appellant]: She keeps telling me she's going to call Legal Aid to help her and I'm trying to get some money together to get mine and keep up my bills at the same time.

The Court: Well, you told us a while ago you didn't even know for sure that she wasn't divorced until right now.

[Appellant]: She's not – the one that's in prison, I don't think she's married to him. She has a husband in Mexico that's married to another woman over there, that she didn't know he was married. That was before – like I said, that was before I even got with her. I don't know nothing about what happened in her past, that's what she's told me.

The Court: Well, what about what's happened in your past? You don't know if you're divorced or not, either.

[Appellant]: I know I'm not divorced yet.

The Court: But you're living with another woman, even though you're not divorced.

[Appellant]: Yes, sir.

The Court: And claiming to be common law married to her when that's necessary?

[Appellant]: I've never claimed to be common law married to her. Yes, there is times [sic] she uses my last name.

The Court: Well, yeah, that's how she was introduced to the Court today, was as Yolanda Guajardo Foster.

[Appellant]: Yes, sir.

The Court: Was that just to try and confuse the Court or were those people that introduced her as such confused or who's confused?

10

[Appellant]: She goes by Guajardo. She very seldom uses my last name, except for important stuff that we have together.

Appellant testified that he understood why his criminal history is a concern in this proceeding. He testified that he had sexual intercourse with K.S.'s mother two or three times. He did not know K.S.'s birth date.

## G. The Trial Court's Ruling

After hearing closing arguments, the trial court announced the decision to terminate appellant's parental rights to K.S., stating in relevant part:

[T]he child is the most important part of what the Court is to consider. And my charge is to listen and make a determination about what is in the child's best interest.

[T]here's more to being a parent than doing some tasks that are written down on a service plan. And there's more to being a parent than finally buying the safety features for the electrical outlets and cleaning your house up. There is an issue of morality and responsibility that goes into parenting. And parents have a moral responsibility to teach their children and to bring their children up to be responsible members of society without being threatened or forced or coerced into doing that. And what I see in [appellant] is a pattern that, as recently as two years ago, allowed him to consider his own sexual desires over a moral responsibility to society, which is a further reflection of what I have in the statement that was entered into evidence of him calling a woman and saying really ugly things to her.

I also see he is joined in a committed relationship with [Yolanda] who certainly lacks a basic perception of right and wrong in parental responsibility for the nurturing and maintenance of children.

I also see in [appellant] a person who has four or five other children that he has access to or does not have access to, whatever the case may be, that he visits or does not visit as is most convenient. And suddenly this little girl is the most important thing in his life. And that sort of doesn't ring true when I look at the whole picture of who [he] is. He's gone 49 years and all of a sudden this little precious package has fallen out of the sky and it's the most important thing in his life and he's going to be this whole new person after 49 years of being something else.

11

And so it's my judgment that it is not in [K.S.]'s best interest for [appellant] to be her parent and so I'm going to order that the parental rights of [appellant] are terminated as to the minor child [K.S.].

## II. DISCUSSION

By three issues, appellant challenges the legal and factual sufficiency of the evidence to support the trial court's termination of his parental rights under Texas Family Code: (1) section 161.001(1)(O), for failure to comply with provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child; (2) section 161.001(1)(E), for engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; and (3) section 161.001(2), because termination of parental rights is in the best interest of the child.

### A. Standard of Review

In *In re J.F.C.*, the Texas Supreme Court outlined the procedure for conducting a legal sufficiency review of parental-rights termination cases as follows:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

> If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must

12

conclude that the evidence is legally insufficient. Rendition of judgment in favor of the parent would generally be required if there is legally insufficient evidence.

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (citations omitted); *see also In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005) (stating that the reviewing court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.").

In a factual sufficiency review, "[w]e must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re C.H.*, 89 S.W.3d at 28). Under this standard, we must consider:

> [W]hether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266 (citations omitted). An appellate court's review must not be so rigorous that the only findings that could withstand review are those established beyond a reasonable doubt. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

**B. Analysis**

Under Texas law, the parent-child relationship may be terminated upon a finding supported by clear and convincing evidence that the parent engaged in certain conduct specified in section 161.001 and termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 23. Both elements must be established; termination may not be based solely

on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

In this case, appellant challenges the trial court's finding that he "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child" and that termination of the parent-child relationship is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(1)(E), (2). Appellant also challenges the trial court's finding that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of K.S. *See id.* § 161.001(1)(O).

## 1. Conduct Endangering the Child

Section 161.001(1)(E) requires the court to look at the parent's conduct alone, including actions or omissions or failures to act. *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). "Endanger" under section 161.001(1)(E) means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533. The term means more than a threat of "metaphysical injury," but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Id.* Nevertheless, there must be evidence of endangerment to the child's physical or emotional well-being as the direct result of the parent's conduct. *In re R.D.*, 955 S.W.2d 364, 366 (Tex. App.—San Antonio 1997, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ).

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions. *Castaneda v. Tex. Dep't of Protective &*

14

*Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied); *In re R.D.*, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); *Dupree*, 907 S.W.2d at 83-84. The conduct to be examined includes what the parents did both before and after the child was born. *Castaneda*, 148 S.W.3d at 522; *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *Dupree*, 907 S.W.2d at 84. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Castaneda*, 148 S.W.3d at 522; *Dupree*, 907 S.W.2d at 84; *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Castaneda*, 148 S.W.3d at 522; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *Castaneda*, 148 S.W.3d at 522-23; *In re N.K.*, 99 S.W.3d 295, 300 (Tex. App.—Texarkana 2003, no pet.).

Our review of the record in the light most favorable to the trial court's findings reveals more than a scintilla of evidence to support the finding that appellant engaged in a course of conduct which endangered K.S.'s physical and emotional well-being. As summarized above, there was testimony from witnesses, including Dr. Moran, Hartley-Harvey, and appellant, that appellant has been engaged in a long-term course of conduct involving marital infidelity, dishonesty, sexual immorality, and criminal misconduct of a sexual nature. The evidence demonstrated that appellant's course of

15

conduct involved both poor judgment and exploitative, even predatory, behavior towards women and children.

The court also heard testimony about appellant's relationship with his paramour, Yolanda, who has a history of being exploited and abused. Yolanda, whom appellant identified as the caregiver for K.S., failed to protect her own biological children against a known sexual predator. Instead, she chose to reconcile with him and blamed her 12-year-old daughter for being a seductress.

There was ample testimony from which the court could find that Yolanda's course of conduct was continuing with appellant, as demonstrated by her willingness to "go along with" appellant's abusive conduct in talking down to her like a child during visits with K.S. and Hartley-Harvey. At the same time, appellant demonstrated his unreasonable expectations for K.S. by telling Hartley-Harvey that the two-year-old child would listen to him and do whatever he says.

We conclude that the foregoing is legally sufficient to support the trial court's finding.

Appellant has also challenged the factual sufficiency of the evidence. As noted above, the standard of review for a factual sufficiency challenge requires the reviewing court to consider the entire record. *J.F.C.*, 96 S.W.3d at 266. In support of his challenge, appellant relies on his testimony that he did not know K.S. was his child until he was notified by the Department. Appellant argues that he could not have engaged in a course of conduct that endangered the child because he had no knowledge of paternity and was not in possession of the child.

Knowledge of paternity is not a prerequisite to a finding of course of conduct endangering a child under section 161.001(1)(E). *See In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied) ("[W]hile knowledge of paternity is a prerequisite to a showing of knowing placement of a child in an endangering environment, it is not a prerequisite to a showing of a parental course of conduct which endangers a child under section 161.001(1)(E)."). Furthermore, to the extent appellant's argument is based on the fact that he was not in possession of K.S., he is arguing that there is no evidence of actual harm to the child, which is not required for a finding of endangerment. *See Boyd*, 727 S.W.2d at 533 ("[I]t is not necessary that the conduct be directed at the child or that the child actually suffer injury.").

Appellant's second issue is overruled.

## 2. Best Interest of Child

In his third issue, appellant challenges the sufficiency of the evidence to prove that termination is in the best interest of the child. In deciding whether the evidence is sufficient to support the trial court's finding that termination is in the child's best interest, we apply the non-exclusive factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the plans for the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (8) any excuse for the acts or omissions of the parent. *See id.*

17

Our review of the record in the light most favorable to the trial court's findings reveals more than a scintilla of evidence to support the finding that termination of appellant's parent-child relationship with K.S. is in the child's best interest. Although appellant has challenged the trial court's finding of endangerment, we have found the evidence both legally and factually sufficient to support the finding of endangerment and we believe that the finding is highly probative on the issue of whether termination is in the child's best interest. While it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues. *In re C.H.*, 89 S.W.3d at 28 (citing *Holley*, 544 S.W.2d at 370; *Wiley v. Spratlan*, 543 S.W.2d 349, 351 (Tex. 1976)).

Furthermore, the Texas Supreme Court has never held that the *Holley* factors are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27. As the Court has explained, "The absence of evidence about some of these considerations would not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.*

In addition to the evidence supporting the trial court's finding of endangerment, there was also evidence regarding the inability of appellant and Yolanda to care for and keep up with a toddler, both physically and emotionally. The record also contains evidence of appellant's inability to provide a stable home and evidence that the parent-child relationship is not a proper one. Yolanda's status as caregiver and step-mother to K.S. was also problematic in light of the fact that K.S. was conceived as a result of

18

appellant's infidelity in his relationship with Yolanda. It was also significant that both appellant and Yolanda are married to other people and have histories of abandoning and losing track of their children from those other marriages. Finally, we note that there was evidence that the Department has permitted K.S. to remain with the family that her mother chose for her, which is willing to adopt her. *See In re C.H.*, 89 S.W.3d at 28. ("Evidence about placement plans and adoption are, of course, relevant to best interest.").

We conclude that the foregoing evidence is legally sufficient to support the trial court's finding that termination of the parent-child relationship is in the best interest of K.S. Furthermore, we note that in challenging the factual sufficiency of the evidence, appellant has not directed this Court to any evidence that is "so significant that a factfinder could not reasonably have formed a firm belief or conviction" that termination of the parent-child relationship is in the best interest of the child. *See J.F.C.*, 96 S.W.3d at 266. The evidence on which appellant relies is his own testimony, which the trial court found "doesn't ring true." *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("recognizing that the factfinder, not the appellate court, is the sole arbiter of the witnesses' credibility and demeanor").

Appellant's third issue is overruled.[2]

---

[2] In his first issue, appellant argues that termination of his parental rights was improper under section 161.001(1)(O), for failure to comply with provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child. However, even if this challenge were sustained, it would not entitle appellant to reversal of the trial court's judgment because we have concluded that the evidence is legally and factually sufficient to support termination under section 161.001(1)(E) and (2). Accordingly, we need not address appellant's first issue. *See* TEX. R. APP. P. 47.1.

### III. Conclusion

The judgment of the trial court is affirmed.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
19th day of July, 2012.