

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| | § | |
| J.S., | § | No. 08-13-00354-CV |
| Appellant, | § | Appeal from the |
| v. | § | 65th Judicial District Court |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee. | § | of El Paso County, Texas |
| | § | (TC#2012DCM03212) |
| | § | |

**O P I N I O N**

In this accelerated appeal[1], Appellant J.S. challenges the trial court's order, entered after a bench trial, terminating her parental rights to her two minor children, G.S.[2] and D.S., in which the Texas Department of Family and Protective Services ("DFPS") was awarded sole managing conservatorship. On appeal, Mother argues that: (1) the trial court erred in allowing an expert psychologist to testify as to her parenting ability based on her I.Q. test results; (2) the evidence was legally and factually insufficient to support termination of her parental rights pursuant to TEX.FAM.CODE ANN. § 161.001(1)(D) and (E); (3) the evidence was factually insufficient to

---

[1] *See* TEX.FAM.CODE ANN. § 263.405(a)(West 2014)

[2] Pursuant to TEX.R.APP.P. 9.8, we shall refer to the subject children as "G.S." and "D.S.," respectively, the subject children's mother J.S. as "Mother," and the subject children's father, M.S. as "Father," the youngest child as "Mi.S.," and J.S.'s paramour as "Cordova."

support termination of her parental rights under TEX.FAM.CODE ANN. § 161.001(1)(N); and (4) the evidence was legally and factually insufficient to support termination of her parental rights under the best interest of the child grounds. For the reasons that follow, we affirm.

**Factual Summary**

In August 2013, DFPS filed their Second Amended Petition and sought the termination of Mother's parental rights based upon TEX.FAM.CODE ANN. § 161.001(1), (D), (E), (N) and (O), and the best interests of the children. The *Order of Termination* was rendered on November 22, 2013, upon grounds (D), (E), and (N), and the best interests of the children. M.S., the father of the children, also had his parental rights terminated with respect to D.S. and G.S.[3] At the time of trial, Mother had three children, D.S., G.S., and Mi.S., but did not possess custody to any of her children. Mother's youngest child, Mi.S., was born during the pendency of this case and is not a child subject of this suit.[4] At the time of trial, November 2013, D.S. was four years' old and G.S. was three years' old.

*Father's Mental Health*

According to El Paso Police Department records in September 2011, police were investigating a possible assault upon Father by a former girlfriend. According to Father's ex-girlfriend, they had a verbal argument and he told her "nobody loves me anyways." He threatened to kill himself by walking onto the freeway. She told police she was able to get him back into her vehicle and drop him off at Mother's residence. Then, Mother called police stating Father had grabbed a knife and was threatening to kill himself. Police officers observed a two inch laceration on his left wrist. He told officers he did not want to live anymore and appeared

---

[3] M.S., Father, does not appeal this order of termination.

[4] Mi.S. was in the process of being adopted by an aunt. Mother had voluntarily relinquished her parental rights to him and a termination order was rendered on July 23, 2013.

2

highly intoxicated.

On November 4, 2011, Mother called police again because Father was attempting suicide. Mother said Father was running into oncoming traffic saying he wanted to end his life. Mother told police she pulled him from the road when he tried to jump in front of a car. Father told officers he has a history of severe depression and had harmed himself in the past. He said he had just recently been released from the hospital but his medication was not helping any longer.

In January 2012, according to El Paso police records, the family was asked to vacate the Salvation Army shelter because coke bottles containing urine had been found in the family's room. When confronted, Father started to bang his head against the wall and punch shelves. Father then grabbed a switchblade knife and cut his left wrist in the presence of the children. Father told responding police officers he did not want to live any longer.

On February 5, 2012, at 4:23 a.m., Mother called police because Father was attempting suicide. When officers arrived at the scene, they found Father in the kitchen with a deep laceration to his left wrist. They asked Father to come out of the kitchen and give them the knife. Father responded he had the knife but officers would have to shoot him for it. Officers recovered the knife. Mother told officers they had argued and Father had been drinking. She told them Father suffers from depression and is not supposed to drink alcohol. Father told officers he was attempting to kill himself because he did not want to live any longer. Due to the depth of his left wrist laceration, Father was taken to the nearest hospital.

*First Report*

On February 20, 2012, when D.S. was two and a half years' old and G.S was a little over one-year-old, DFPS received an intake report alleging neglectful supervision of the children. Mother admitted to DFPS she had left the children alone with Father knowing he suffered from

3

mental health issues. According to Mother, they had been living together since 2008 and until October 2011, she was unaware if Father had ever been diagnosed for any mental health concerns. At trial, she testified she and Father were "living in the streets" in October 2011 when she first became aware of Father's mental health issues. Mother stated Father referred himself to Mental Health and Mental Retardation Services in October 2011 and was assigned a psychiatrist. Mother stated she had no support system and her only option was to leave the children with Father.

Father told DFPS's investigator, he suffered from depression, was taking medication for his diagnosis, and had been hospitalized at the El Paso Psychiatric Center multiple times for suicidal ideation. Father stated Mother had previously placed the children at the Child Crisis Center during one of his hospitalizations so she could continue working.

Mother told DFPS she was aware Father had threatened to kill himself at the homeless shelter. She said Father had difficulty controlling his depression, even though he was taking his medication. Mother asserted, in spite of Father's "meltdowns," his suicidal behavior was never directed towards the children. During the final hearing, Mother acknowledged she did not properly supervise the children when she had left them alone with Father while he was suffering from mental health issues. On February 22, 2012, Mother signed a safety plan with DFPS and agreed not to leave the children alone unsupervised with Father.

*Second Report*

A few weeks later, Monday, March 12, 2012, DFPS received a second intake report which alleged physical abuse of G.S. Luis Alvarez, an early intervention specialist, who works with children experiencing developmental delays, went to Mother's home at 9:00 a.m. to work with both children. D.S. was experiencing language delays and G.S. was not walking. Once

4

Alvarez arrived, he immediately noticed G.S. had bruises on her face. Alvarez told police detectives he observed three bruises around G.S.'s mouth and one on her forehead. Mother told him G.S. had fallen from her playpen. Mother claimed G.S. had climbed into the playpen, but Alvarez had never seen G.S. do that. Further, given G.S.'s weak legs, he did not believe G.S. was strong enough to climb into the playpen unassisted. He called 911.

When police detectives attempted to interview Mother, they found her very uncooperative and confrontational. Photos were taken of G.S., in which "scrapes" were observed on her back, a leg, and another bruise on her arm. G.S. began vomiting and suffering from diarrhea. Mother insisted G.S. be taken to the hospital. Given their suspicions, police detectives told Mother she could not be left alone with G.S. Detectives called paramedics for G.S. G.S. began to cry. Detectives observed Mother grabbing G.S.'s face and telling her to calm down in an angry tone. According to police reports, detectives saw Mother grab G.S.'s face in such a way that it "coincided with the injuries" G.S. had on her face.

Mother told the paramedics who treated G.S. she had been crawling too fast and hit her head on the crib. Paramedics noted Mother seemed very agitated and G.S. would not stop crying. Mother insisted she wanted to take G.S. to the hospital and told responding paramedics she felt she was being accused of abusing G.S. Mother was overheard telling another paramedic G.S. had fallen off her crib. G.S. was taken to the hospital.

According to DFPS's investigator, seventeen-month-old G.S. was observed to have multiple bruises upon her face, arms, and back. She had one bruise protruding from her forehead with numerous other facial bruises that were described as purple and greenish in color. The bruises on her arms ranged in size from a dime to a quarter. Mother stated the protruding bruise on G.S.'s forehead was the result of G.S. hitting her forehead against the playpen metal bottom

when G.S. had jumped into the playpen. Mother asserted the other bruises had been caused by her two-and-half-year-old sister, D.S.

At the emergency room, G.S. was noted to have a history of failure to thrive and did not talk, walk, or crawl. G.S.'s medical records indicated that "different stages (of bruising) noted to the right and left cheeks, above right side of lip, on forehead, on left posterior, upper and lower arm, lower back, left and right anterior legs, and on diaper/vaginal area." G.S. was initially diagnosed with failure to thrive, gastroenteritis, and suspected physical abuse.

At the hospital, Mother said G.S. "was climbing in her playpen and fell into it" but no explanation was offered for the bruises found on G.S.'s spine, left arm, and left leg. The DFPS investigator informed medical staff G.S. cannot stand alone or walk. Hospital staff observed, "Mom seems very defensive. EMS states that he was told that patient fell on Saturday morning but she is stating upon arrival that it was Saturday evening."

According to the medical records, G.S. "continues to cry constantly" while Mother tells her "Mommy won't let anyone hurt you. I would kick their ass if someone hurt you." Later, Mother is heard yelling "at CPS [child protective services] workers" saying "[t]hey are making me frustrated. How would you like someone telling you how to raise your child." Mother was told by hospital staff "that if she kept yelling security would remove her from room since it was upsetting patient." G.S. was ultimately diagnosed with failure to thrive, an ear infection, diarrhea, and child abuse.

DFPS's investigator testified the emergency room doctor told her due to the different stages of G.S.'s bruises, he "couldn't give an exact date of when they could have happened. So this had to be continuous and stated that this would be a case of abuse or neglect until proven otherwise." Upon learning of G.S.'s diagnosis of failure to thrive, Mother's response to DFPS

6

was G.S. "was fine" and Mother "hadn't noticed anything." On March 15, 2012, DFPS was awarded temporary custody of D.S. and G.S. G.S. was released from the hospital to DFPS.

During the investigation, DFPS discovered Father had had another psychiatric admission on March 6, 2012 as the result of a "meltdown." Mother told DFPS Father had had a "meltdown" because G.S. would not stop crying. DFPS's investigator questioned both Mother and Father as to whether Father had caused G.S.'s bruises. Father asserted he was not home when G.S. received her bruises. Both parents denied that Father was the cause of any of G.S.'s injuries.

A couple of days later, Father called the investigator saying Mother had caused G.S.'s physical injuries. Mother was heard yelling in the background, "Why are you doing this? You're going to get me in trouble. What's wrong with you?" Mother called DFPS a few days later explaining that Father was under the influence of alcohol and that was what prompted his call.

Mother was arrested in September 2012 for Injury to a Child. The indictment stated Mother had caused bodily injury to G.S. by grabbing her about the face and squeezing with Mother's hand. Mother pled guilty to injury of a child and received four years' deferred adjudication.

*Third Report*

About one month after D.S. and G.S. had been removed from their parents' custody, DFPS received a third intake report on April 24, 2012. This report alleged Mother and Father had engaged in a physical altercation while Mother was holding their three-day-old child, Mi.S.[5] Father admitted to DFPS he had been arguing with Mother, got frustrated, and punched her in the head. Both parents told DFPS as they began to argue, Mother was holding Mi.S. However,

---

[5] Mi.S. was born in April 21, 2012 after D.S. and G.S. were removed from the home.

7

Mother's aunt took Mi.S. from Mother's arms, so Mi.S. was not involved in his parents' altercation. As soon as Mother's aunt retrieved Mi.S., Father punched Mother in the head. DFPS found reason to believe both parents were neglectful in their supervision of Mi.S. After Father's arrest, Mother and Mi.S. moved in with Mother's aunt and uncle. As a result of Mother and Father's separation, DFPS did not remove Mi.S. from Mother.

*Fourth Report*

In July 2012, DFPS received a fourth intake report alleging neglectful supervision and physical abuse of Mi.S. Mother told DFPS on July 4, 2012, in Mi.S.'s presence, Father had hit and choked her. Father told DFPS he and Mother had been arguing. Mother began pushing him while holding the infant Mi.S. Father explained he waited until Mother put Mi.S. down, then he punched her in the face and attempted to choke her. Father was arrested on July 5, 2012, for a family violence assault. Mother told the trial court this was the last time she saw Father outside of court. Father was arrested in August 2012 for violation of protective order after he went to Mother's residence. In December 2012, Father pled guilty to a third degree felony of assault family violence by impeding Mother's breathing or normal circulation of her blood by blocking her nose or mouth.

In July, DFPS learned Mother had allowed Father to return to her residence after the April 2012 assault. Further, she had failed to disclose that information to DFPS, and admitted she lied when she asserted to DFPS Father was not living with her. Mother admitted to DFPS after Father was arrested in April 2012, she had bailed him out of jail, although she later denied that.

The Family Service plan of May 16, 2012, enumerated the services Mother was to complete to achieve the goal of family reunification. According to DFPS, Mother failed to

8

participate in any of these required services from the removal of the children in April through to July 2012. Mother's failure to engage in services prompted DFPS to initiate a safety plan which was signed by Mother on July 24, 2012.

*New Relationship*

Mother began a new relationship with a paramour, Cordova, in December 2012, and they moved in together March 2013. Prior to residing with Mother, Cordova testified he had been living on the streets on and off for about five years. Cordova stated he was willing to do anything for Mother and to "be there" for her children. Cordova stated he had been asked to attend parenting classes but had failed to do so. Cordova testified he intends to maintain a long-term relationship with Mother. When asked if he would step aside for her children, he responded he would continue to be involved with her.

Cordova denied any problems with drugs or alcohol but had been arrested for possession of marijuana and convicted for driving while intoxicated. Cordova was arrested in February 2013 for a possession of marijuana charge and told the trial court the marijuana belonged to his friend, David. Cordova confirmed David had visited Mother's residence on occasion.

DFPS's caseworker testified they had received reports Mother and Cordova had been confronted about an odor of marijuana coming from Mother's residence. Mother testified her current landlady had complained that she "smells weed coming out of my apartment. But how, when [Cordova] is not even there?" Mother stated one night when she went to unplug her iPad, she smelled marijuana and complained to the landlady. Mother told the landlady the "people down next to me, upstairs, are smoking marijuana and you guys are always saying it was [Cordova] when [Cordova] is not even here." DFPS continued to have concerns regarding Cordova because of his February 2013 arrest for possession of marijuana and his failure to

9

cooperate with DFPS.

In May 2013, Mother signed a safety plan in which she agreed not to allow any individual unapproved by DFPS access to D.S. and G.S. while Mother had unsupervised visits. However, at trial, she admitted Cordova had been living with her and asserted DFPS was aware of it. During an unannounced inspection of the home in June by DFPS, when Mother had unsupervised visitation with the children, Cordova was found hiding in one of the bedrooms. In July 2013, Mother signed another safety plan promising DFPS she would not allow Cordova to stay in her home with D.S. and G.S. until DFPS approved him. Mother admitted she had allowed Cordova to stay in the home after she agreed not to, because DFPS cannot dictate whom she allows in her home. According to Cordova, he moved out back to the "streets" in August 2013. However, he did admit to being in Mother's home a couple of times in September 2013.

On September 5, 2013, a caseworker from DFPS observed Mother and Cordova walking out of her residence together. Mother told DFPS's caseworker Cordova was there to help her with the children. At trial, Mother testified she had not seen Cordova since he moved out in August. The evidence showed Cordova had signed for and received certified mail at Mother's address on October 8, 2013, although she denied he was living with her at that time.

<em>Fifth Report</em>

In May 2013, DFPS began a transition plan to place the children with Mother and allow unsupervised, overnight visits. On August 7, 2013, DFPS received another intake report alleging physical abuse of G.S. by Mother. Pursuant to DFPS's plan, Mother and children were to be reunified. According to the investigator, the alleged physical abuse took place during Mother's first overnight, unsupervised visit with the children.

D.S., the four-year-old, told DFPS's investigator Mother had hit G.S. on the head with an

10

open hand because G.S. had defecated on the carpet. D.S. physically demonstrated to the investigator how Mother had hit G.S. D.S. also told DFPS's investigator "mommy was mean to [G.S.]." When the investigator questioned two-year-old G.S. what had happened, "she said mommy – indicated mommy hit her."

Mother admitted G.S. had had an accident on the carpet but denied hitting her stating, "I would never spank my kids." Mother complained DFPS never allowed her an opportunity to tell them what had happened. Mother asserted DFPS did not investigate whether the children's statements were true or not. According to the DFPS investigator, Mother stated the only other person in the home during that time was Cordova.

*Mother's testimony*

According to Mother's evaluating psychologist, Dr. Schutte, Mother told him she had left the children alone with Father in March 2012. While she was out, she had received a text from Father stating he was "unable to stand G.S." She told Dr. Schutte, after she arrived home, she found G.S. bruised and Father had attempted suicide by overdosing on his medication. Dr. Schutte testified Mother told him she had lied to DFPS about G.S.'s injuries because she was afraid Father would have assaulted her if she had told the truth.

At trial, Mother continued to assert she did not hit G.S., even though she had pled guilty to injury of G.S. However, she did admit she had lied to DFPS as to whether Father had caused G.S.'s bruises in March 2012. According to Mother, "if I would have told the truth, and [Father] would have found out that I told the truth about what really happened, I would have had it coming, worse than what happened to me on [July 4]." Mother further testified she had pled guilty only because she would have lost at trial. Mother denied she pled guilty to cover for Father and she had never lied to protect Father. Mother stated if DFPS had not been involved

11

with her and her children, she would have fought the criminal charges.

Mother explained the first time Father assaulted her was on April 23. According to Mother, she had arrived at the family home from the hospital with their newborn son and found him living there with another woman and the woman's two kids. Father hit Mother on the back of the neck, but Mother told the trial court that Mi.S. was not in the apartment at the time. Mother tried to get Father to leave but he would not so she allowed him to stay with her because "I thought he was going to change."

Mother testified Father had never abused her until the family moved from the Salvation Army. When asked how often the abuse occurred, Mother replied that "[i]t didn't occur that often. The only time it did escalate really, really bad, to the point I was almost killed at the time, was July 4th to July 5th. If it wouldn't have been for my screams, and if it would not have been for my maintenance guy at that time . . . I would not be here right now." Mother asserted she kicked Father out when it first occurred but he refused to leave.

Mother admitted she had lied to DFPS when she failed to tell DFPS Father was still living with her and their newborn son, Mi.S. from April until his July arrest. Mother also admitted she had told conflicting stories regarding the truth about G.S.'s bruises. She stated she lied because she was scared for herself and her kids of Father's "physical abuse." At trial, Mother vigorously denied she had bailed Father out of jail after the April 2012 arrest. She denied she had told Dr. Schutte that she had held any of her children prior to any domestic violence incident, although she did admit to telling Dr. Schutte she had lied to DFPS. Mother also admitted she continued to allow Cordova to live with her even after she had been told Cordova was not allowed in the home.

Mother stated she did not have any support to help take care of the children. She told the

12

trial court her family members either could not or would not help her with the children. Mother acknowledged Dr. Schutte's concern that she did not have any outside support. She stated the only family member who could possibly provide any support would be her Aunt Rosa. However, Mother admitted her aunt could only provide emotional support because the aunt had adopted Mi.S. and could not help take care of D.S. and G.S.

Mother admitted she did not visit her children every opportunity she had. She told the trial court "I'm not gonna lie. I did miss a lot." According to Mother, the missed visits were the result of lack of transportation and her pregnancy. Mother stated that she suffered from a high risk pregnancy with Mi.S. and was confined to bed on occasion. She also suffers from deep vein thrombosis since 2003 and could not stand for long periods of time waiting for a bus. DFPS moved the visits to a park near her home and she conceded she missed those visits as well. Mother said the missed visits with her children near her home was the result of her not having enough money to buy her daughters something to eat. Mother did not go because, "I didn't want to see that sad face on – that sad look on their faces when I told them, Mommy can't get you pancakes or mommy can't get you what you want. It sucks having that feeling, seeing that." However, Mother stated she had been consistent with her visits from February through November 2013.

According to DFPS, Mother did not become consistent with her visitation until April 2013, although November and December 2012, she visited with her children once each month. DFPS also testified when Mother did not show up for visitation, she did not call DFPS to advise them she was unable to visit with her children.

Mother conceded she had not kept in regular contact with her caseworker because she did not always have a phone. At the time of trial, she was facing the possibility of eviction and was

13

looking for a new apartment to include room for the children. Mother testified she had purchased numerous videos and gifts for the children. Mother has taken pictures and videos on her iPad of D.S.'s birthday party, the children dancing, and kissing her. Mother testified her children love her and are constantly telling her they want to come home. Mother admitted that D.S. does not like to call her "mommy," and calls Mother either "teacher" or "poppy."

Mother stated her plan for her children was "to be with people. I want them to have a good education." Mother began attending Southwestern University May 2013 as a medical billing and coding student, and anticipated graduating in August 2014. Mother completed her parenting classes and had never tested positive for drugs. Mother, at the time of trial, had supervised visitation with the children twice a week for two hours in her home.

DFPS asked Mother to begin family therapy in September 2013, and she complied. At the time of trial, Mother had completed five sessions with the children and the family therapist. Mother testified she and G.S. "did not have a certain special bond . . . ." However, Mother maintained she and G.S. had become closer through their five family therapy sessions. Mother asserted G.S. loves her and would tell her "Mommy, I miss you." Mother stated the therapy was helping her parent her children better. Mother reiterated at trial she loved her children and would "do whatever it takes to get those girls back."

DFPS's goal, until the August 2013 report, was family reunification with Mother. DFPS's caseworker stated Mother had not incorporated the parenting techniques she was taught. According to the DFPS caseworker who supervised the children's visits with Mother, she seemed to lack patience for the children. The caseworker observed when the children are "jumping or doing just kid's stuff. She puts on a movie and then the children just watch a movie. She doesn't interact much with them. . . . There's no love or nurture." On another supervised

14

visit, a DFPS caseworker reported Mother "was very mean to the children. She was not patient with them. She was angry with them. Children couldn't even talk to her because she was upset." The DFPS caseworker also noted their concerns of the lack of attachment or bonding between Mother and G.S.

At trial, DFPS stated their plan for D.S. and G.S. is adoption by their foster parents. The children's ad litem's recommendation was to terminate Mother's parental rights because he believed it was in the best interests of the children.

### Expert's Opinion Testimony

Mother asserts on appeal that the trial court erred in receiving and considering the testimony of Dr. Schutte, Mother's evaluating psychologist, when he opined that Mother could not parent her children without additional support. She argues that this evidence should not be considered for any purpose because it is plain error, irrelevant, and in reasonable probability prejudicial to her. Mother specifically objects to Dr. Schutte's conclusion that Mother's parental abilities were negatively affected by her low or borderline I.Q. is "speculative, prejudicial, and bereft of methodological rigor."

To present a complaint for review on appeal, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought with sufficient specificity to make the trial court aware of the complaint. TEX.R.APP.P. 33.1(a)(1). Even constitutional complaints can be waived by failure to object at trial. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 376-77 (Tex. 2009); *Magnuson v. Mullen,* 65 S.W.3d 815, 829 (Tex.App.--Fort Worth 2002, pet. denied). As shown in the following, Mother failed to object to the expert's, Dr. Schutte's, testimony:

> DFPS Atty: Based on all of the testing and everything that she told you, and everything you know about her past, if we were to place two young children back

in her care, and if another man, similar to her husband, was around, can we expect this woman to protect those children?

Dr. Schutte: My concern is primarily with her low IQ scores. An individual with IQs this low is going to have a great deal of difficulty caring for children in a safe and effective manner, is going to need some sort of outside assistance in order to parent effectively. That's my primary concern with [Mother].

DFPS Atty: So she would need a support system; is that what you're saying?

Dr. Schutte: That's correct, some outside, competent support system to assist her with child care.

DFPS Atty: Not some homeless guy that she met at a bus stop? It would have to be someone capable?

Dr. Schutte: That's correct. Someone competent and capable of caring for children.

DFPS Atty: And unless she has that, would you recommend returning two young children to her care?

Dr. Schutte: No, I would not in light of her low IQ scores.

DFPS Atty: Thank you, Doctor. . . . I'll pass the witness.

Further, Mother's counsel extensively cross-examined the psychologist. As the following demonstrates, Mother's counsel questioned Dr. Schutte repeatedly regarding her I.Q. scores:

Mother's counsel: Okay. When you indicated, Doctor, that your primary concern is her low I.Q., what recommendations did you give to the Department in assisting [Mother] with her low IQ and your concerns?

Dr. Schutte: Well, unfortunately, low IQ is not something that we can remediate. There's no treatment for that. Certainly, the only assistance that could be offered would be support and caring for her children.

Mother's counsel: And so is it your assessment that once – using myself as an example, once I've been diagnosed with a low IQ, I'm not going to be able to raise my I.Q. subsequently, Doctor?

Dr. Schutte: That's correct.

16

Mother's counsel: Okay. And so your initial assessment of my client, [Mother], is that she is permanently locked into this below five percent of the population IQ; is that correct, Doctor?

Dr. Schutte: Once an individual reaches teenage years, IQ is not going to change by more than a point or two. So it is, unfortunately, a permanent condition at this time.

.        .        .

Mother's counsel: On any of your testing, did you flat out determine that she was unsuitable to parent children?

Dr. Schutte: No, but as I mentioned before, I have concerns because of her low IQ scores and I feel someone with those scores would need outside assistance in order to safely parent her children.

In fact, Mother's counsel objected to DFPS's question of Mother regarding the safety plans on the following basis:

Judge, I don't believe she's had an opportunity to go through all the safety plans. And it's very argumentative of this [DFPS attorney] if his own expert witness has approximated my client's low IQ to be less than 95 percent of the population. We would ask perhaps for a momentary pause or continuance to allow my client with such a low IQ to be able to go through these three official documents.

Mother's argument of "plain error" fails to cite to any state or federal statute or case to support her assertion that the trial court erred. Plain error is a federal doctrine in criminal cases that is codified in the Federal Rules of Criminal Procedure. *See* FED.R.CRIM.P. 52(b)("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention"). Implicit in this argument is Mother's tacit acknowledgement that she failed to object to the testimony that she now complains of. Our review of parental termination cases has failed to uncover any application of the "plain error" doctrine. Therefore, we decline to do so in this case.

Mother failed to lodge the requisite objection and obtain a ruling thereon regarding the complaint that she now raises on appeal. Further, she was afforded the opportunity to cross-

17

examine Dr. Schutte extensively upon his conclusions and did so. Consequently, Mother has failed to preserve this complaint for our consideration. We overrule Issue One.

**Standard or Review**

Termination of parental rights requires proof by clear and convincing evidence. TEX.FAM.CODE ANN. § 161.001 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). In addition, the Due Process Clause of the United States Constitution mandates this heightened standard of review. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Every parent has a fundamental liberty interest in their child and the state must provide parents with fundamentally fair procedures, including clear and convincing evidentiary standard, when seeking to terminate parental rights. *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2014); *J.F.C.*, 96 S.W.3d at 264.

Due to this elevated burden of proof, the traditional legal and factual sufficiency standards of review are inadequate. *J.F.C.*, 96 S.W.3d at 265; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In conducting a legal sufficiency review or "no evidence" challenge in a parental termination case, the reviewing court should consider all the evidence in the light most favorable to the challenged finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005), *quoting J.F.C.*, 96 S.W.3d at 266. Giving appropriate deference to the fact finder's conclusions, our role in conducting a legal sufficiency review entails looking at the evidence in the light most favorable to the judgment meaning we must assume that the fact finder resolved

18

disputed facts in favor of its finding if a reasonable fact finder could do so. *In re J.P.B*, 180 S.W.3d at 573. We do not disregard the evidence supporting the finding, but rather consider all the evidence, not just that which favors the verdict. *Id.; see City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). A legal sufficiency challenge will only be sustained when the record reveals one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

In conducting a factual sufficiency review in parental termination cases, we are required to give due deference to the fact finder's findings and we cannot supplant the fact finder's judgments with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d at 108, *quoting J.F.C.,* 96 S.W.3d at 266. A factual sufficiency review, unlike a legal sufficiency analysis, instructs us to focus not only the undisputed evidence that supports the termination but the disputed evidence as well. *J.F.C.,* 96 S.W.3d at 266. Thus, if the evidence is factually sufficient, then, it is also legally sufficient. Logically, it follows that if the record reveals enough evidence to enable the fact finder to reasonable form a firm belief or conviction regarding the facts, there cannot be "no evidence" under a legal sufficiency analysis.

### Statutory Grounds for Termination - Section 161.001(1)(D) and (E)

In a proceeding to terminate parental rights, a petitioner must demonstrate by clear and

convincing evidence that: (1) the parent committed one or more of the acts specifically set forth in Texas Family Code § 161.001(1) as grounds for termination; and (2) that termination is in the best interest of the child. *See* TEX.FAM.CODE ANN. § 161.001. "Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re S.F.*, 32 S.W.3d 318, 320 (Tex.App.--San Antonio 2000, no pet.); TEX.FAM.CODE ANN. § 161.001(1). We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights as well as the finding of best interest. *In re E.A.G.,* 373 S.W.3d 129, 141 (Tex.App.--San Antonio 2012, pet. denied).

Section 161.001(1)(D) and (E) allow a court to terminate the parent-child relationship if the court finds clear and convincing evidence that the parent has:

> (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

TEX.FAM.CODE ANN. § 161.001(1)(D) and (E).

Both (D) and (E) use the term to "endanger." To "endanger" means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *See Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex.App.--Houston [1st Dist.] 2002, no pet.), *citing Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See Castaneda v. Tex. Dep't of Protective and Regulatory Servs.*, 148 S.W.3d 509, 521-22 (Tex.App.--El Paso 2004, pet. denied). Endanger means "more than a

20

threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child suffer injury." *Castaneda,* 148 S.W.3d at 522. The conduct of a parent or another in the home can create an environment that endangers the physical or emotional well-being of a child. *In Interest of W.S.*, 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ).

Subsection (D) requires a showing that the parent has knowingly placed or knowingly allowed the child to remain in an environment which endanger the child's physical or emotional health. TEX.FAM.CODE ANN. § 161.001(1)(D). Subsection (E) permits a court to terminate parental rights if a parent has engaged in conduct or knowingly placed a child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. TEX.FAM.CODE ANN. § 161.001(1)(E). Subsection (E) allows termination not only based upon the direct result of parental course of conduct, but also upon conduct not specifically directed at the child, or cause actual injury to the child, or even be a "concrete threat" of injury to the child. It is sufficient that the child's physical or emotional well-being is jeopardized by the parent's actions, omissions, and failure to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex.App.--San Antonio 2000, pet. denied). Evidence of the treatment of other children is relevant to determine if a course of conduct has been established under (E). *In re K.R.G.,* No. 02-12-00384-CV, 2013 WL 3179498, at *20 (Tex.App.--Fort Worth Mar. 21, 2013, pet. denied)(mem.op.).

### Best Interest

In a termination of parental rights, there is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006). To determine whether termination is in the child's best interest, courts apply the non-exhaustive *Holley* factors. *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976). These include, but are

21

not limited to: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* at 371-72. It is not required to prove all, or even a majority, of these factors. *Walker v. Tex. Dep't of Fam. & Protective Servs.,* 312 S.W.3d 608, 619 (Tex.App.--Houston [1st Dist.] 2009, pet. denied)(citing *In re C.H.*, 89 S.W.3d at 27).

The trial court's determination of best interest of the child in terminating parental rights must focus on the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex.App.--Dallas 1995, no writ). Further, the permanent placement of the child is paramount in consideration of a child's present and future needs. *Id.* at 87. The evidence supporting the predicate ground(s) may also be used to support the finding that termination is in the best interests of the child. *In re D.S.,* 333 S.W.3d 379, 384 (Tex.App.--Amarillo 2011, no pet.). Lastly, the best interest finding must be based on clear and convincing evidence. *See* Section 161.001(2); *In re C.H.,* 89 S.W.3d 17, 25, 28 (Tex. 2002).

*Sufficiency*

In her second issue, Mother argues on appeal that DFPS did not terminate or attempt to terminate her parental rights based Texas Family Code § 161.001(1)(L)(ix). If a parent has under Subsection (L) been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or

serious injury of a child under the following sections of the Penal Code or adjudicated under Title 3 for conduct that caused the death or serious injury of a child and that would constitute a violation of one of the Penal Code sections:

(ix) Section 22.04 (injury to a child, elderly individual, or disabled individual);

TEX.FAM.CODE ANN. § 161.001(1)(L)(ix). Thus, she asserts, DFPS could have easily terminated her parental rights.

According to Mother, she pled guilty to the injury of a child only after consultation with DFPS and their representation to her the children would be reunified. Therefore, as a result, Mother urges this Court to weigh the evidence of her actual acts or omissions without reference to her guilty plea to determine whether there is legal or factual sufficiency to support the termination grounds. The gist of her argument seems to be DFPS has waived the evidence of Mother's conviction because ground (L) was not pleaded and DFPS induced Mother to plead guilty. Mother does not cite to any law to support her argument and our research has failed to discover any.

However, we have recently decided a case that bears upon this question. In *R.F.*, Father pled guilty to indecency with a child, one of the enumerated Penal Code sections under § 161.001(1)(L). *R.F. v. Texas Dept. of Family and Protective Services,* 390 S.W.3d 63, 67 (Tex.App.--El Paso 2012, no pet.). Father appealed the termination of his parental rights and argued the trial court had erred in excluding his testimony regarding his guilty plea. *Id.* at 70-71. Father's bill of exception included testimony that he had never sexually abused his daughters. *Id.* at 71. Further, he had pled guilty only because of his prior felony convictions could result in a sentence of fifteen years. *Id.* Father asserted he "wanted to get out as quickly as he could so that he could do whatever he needed to do to keep the family together." *Id.* at 370-71. We

23

concluded that Father's "guilt had already been determined in the prior criminal proceeding. Therefore, the issue of [his] guilt could not be relitigated, regardless of the reasons for his guilty plea." *R.F.*, 390 S.W.3d at 72. *See In re A.H.L., III,* 214 S.W.3d 45, 56 (Tex.App.--El Paso 2006, pet. denied)(no authority for a collateral attack on a final conviction in a parental termination case).

It is uncontroverted Mother pled guilty to injury of a child and received four years' deferred adjudication supervision. Like the Father in *R.F.,* Mother denies she committed the injury to a child. Secondly, she asserts, her plea of guilty, presumably under oath, was motivated by her fear of Father coupled with DFPS's reassurance her children would be reunified with her. This Court in *R.F.* concluded there is no authority to collaterally attack a criminal conviction in a parental termination case. *Id.* Therefore, we are not inclined to peer behind Mother's guilty plea to injury of G.S. and will not disregard it in our sufficiency analysis.

Mother pled guilty to injuring G.S. At trial, Mother also acknowledged she knew of Father's mental health issues and left the children alone with him. Mother signed a safety plan with DFPS in February 2012 assuring them she would not leave the children alone with Father. According to Mother, in March 2012, she left the children alone with Father after she signed the February safety plan. Furthermore, if Mother's statement that Father caused G.S.'s injuries is accurate, we must conclude she knowingly placed the children with a person who engaged in conduct that endangered the children.

We have carefully reviewed the entire record. Considering all of the evidence, we find the disputed evidence a reasonable fact finder could not have credited in favor of the finding is not so significant that the trial court could not have formed a firm belief or conviction pursuant to Section 161.001(1)(E). Giving due deference to the fact finder's findings, the evidence is

24

factually sufficient to support the finding that Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the children's physical or emotional well-being.

Having found the evidence is both legally and factually sufficient to support termination based on Section 161.001(1)(E), we will not address the trial court's findings related to Subsections (D) and (N). Mother's issues of legal and factual sufficiency in Issues Two and Three are overruled.

*Best Interest*

1. *The desires of the child.*

At the time of trial, the children were young and unable to fully articulate their desires. However, we do take note that the oldest child, D.S. did not call Mother "mommy" and described her as "mean." Although Mother testified the children loved her and wanted to come home.

2. *The present and future physical and emotional needs of the child.*

The children need a home that fulfills at a minimum their most basic needs. Mother's lackadaisical attitude and inability to recognize that G.S. suffered from a failure to thrive is indicative of her capability to meet the children's needs. At trial, Mother was facing eviction, lacked a bond with G.S., and was not nurturing.

3. *The present and future emotional danger to the child.*

The children require a home that is free from physical abuse and domestic violence. Mother's refusal to adhere to DFPS requests on multiple occasions indicates her poor judgment regarding the emotional danger to her children. She promised not to leave the children with Father in February 2012 and she did. She promised not to allow Father back in the home after

25

the April 2012 assault and she did.  She promised not to allow Cordova in the home in May and July 2013 and she did.  Moreover, her decision to leave the children with Father despite his repeated suicide attempts and psychiatric history presented a clear emotional danger to them.

4.  *The parental abilities of the persons seeking custody in promoting the best interest of the child.*

Mother did complete her parenting classes, had never tested positive for drugs, and was enrolled in school.  Mother admitted she missed "a lot" of her visitation with her children, even when the visits were changed to accommodate her.  Mother admitted she did not have any support to help with her children.  Mother lacks a bond with G.S.  Despite nearly sixteen months of intervention and services by DFPS, the children reported Mother had hit G.S.

5.  *Available assistance programs.*

The record revealed that D.S. would be receiving speech therapy and G.S. attends play therapy.

6.  *The plans for the child by the individuals or agency seeking custody.*

DFPS plan is for the children to be adopted by their foster parents.

7.  *The stability of the home or proposed placement.*

The record revealed the children have been placed in their foster home for about one year and required no psychotropic medication.

8.  *Acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate.*

To reiterate, Mother failed to recognize the danger in leaving the children with Father, even after she had stipulated to DFPS she would not.  Mother was observed touching G.S. in such a way to cause the injuries that she ultimately pled guilty to.  Mother insisted her paramour, Cordova, would continue to reside with her regardless of the DFPS's concerns and

26

admonishments not to allow him in the home. Mother failed to recognize the endangerment of the children by the continuing domestic violence perpetrated by Father up and until she was, according to her, choked and nearly killed. Despite Mother's shortcomings, DFPS persisted in their goal of family reunification until the first overnight, unsupervised visit with Mother in which she hit G.S. on the head.

*9. Any excuse for the parent's acts or omissions.*

Mother's testimony indicates she was not completely aware of Father's mental health issues, however, the El Paso police records belie that assertion. Mother explains her missed visits were the result of her high risk pregnancy with Mi.S., however, he was born about one month after the children were removed. She also states she was either ill or did not have transportation. According to DFPS, Mother did not start visiting the girls regularly until April 2013, almost a year after they had been removed. Mother testified that she did not visit because she did not want to see their sad faces when she could not buy them what they wanted.

Therefore, after considering the evidence, the *Holley* factors, the undisputed acts or omissions under Section 161.001(1) of the Code, we hold there is factually and legally sufficient evidence to support the trial court's determination that termination of Mother's parental rights was in D.S. and G.S.'s best interest. Under the clear and convincing standard, we find the evidence is such the trial court could have reasonably formed a firm belief or conviction that termination was in the best interest of these two children. Issues Four and Five are overruled.

Having overruled Mother's issues regarding the sufficiency of the evidence to support the termination of her parental rights and admission of the testimony regarding her parental abilities as it relates to her I.Q. results, we affirm the judgment of the trial court.

October 29, 2014

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J. (Not Participating)